[No. S078404. Aug. 9, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER HOAN BRADY, Defendant and Appellant.

550

COUNSEL

Susan K. Marr, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—A jury convicted defendant Roger Hoan Brady of the first degree murder of Officer Martin Ganz of the Manhattan Beach Police Department. (Pen. Code, §§ 187, subd. (a), 189.)[1] It found true special circumstance allegations that the murder was committed against a peace officer engaged in the performance of his duties (§ 190.2, subd. (a)(7)) and for the purpose of avoiding or preventing a lawful arrest (*id.*, subd. (a)(5)); it also found true a special circumstance allegation that defendant had previously been convicted of murder (*id.*, subd. (a)(2)). The jury further found that

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

defendant had personally used a firearm in the commission of the offense. (§ 12022.5, subd. (a).) The jury returned a verdict of death. The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## DISCUSSION

I. *Guilt Phase*

 A. *Facts*

 1. *Prosecution Evidence*

On the evening of December 27, 1993, Officer Martin Ganz of the Manhattan Beach Police Department was on patrol duty in a marked police vehicle. He was wearing his patrol uniform, which was dark blue or black, and a badge. Ganz's 12-year-old nephew, Don Ganz (Don),[2] accompanied him on a department sanctioned "ride along." During the shift, Officer Ganz stopped numerous motorists for routine traffic violations; he also showed Don how to use the police radio.

About 11:00 p.m., while stopped at a traffic signal, Officer Ganz noticed on the opposite side of the street a small grey or silver car being driven by defendant, who was on supervised release following a federal prison term and was subject to the condition that he not possess a firearm or other dangerous weapon. The car was stopped past the limit line of the crosswalk, partially blocking the intersection. Officer Ganz activated the patrol vehicle's spotlight and shined it on defendant, and over the vehicle's public address system Officer Ganz instructed defendant to back his car up. Defendant backed up a short distance, but his car was still over the limit line, so Officer Ganz repeated his instruction to move back. Defendant again did so, but he still was not behind the limit line.

When the traffic light changed, defendant turned into a shopping mall parking lot. Officer Ganz drove behind defendant's car and activated his patrol vehicle's overhead flashing red and blue lights. Defendant stopped his car in front of a bank, and Officer Ganz stopped his patrol vehicle about three to four feet behind defendant. He got out of the patrol vehicle, approached the driver's side window of defendant's car, and spoke with defendant for a

---

[2] We occasionally refer to various related persons by their first names, not from disrespect, but to avoid confusion.

few minutes. Jennifer La Fond, who worked at one of the stores in the mall, was driving by as Officer Ganz walked toward defendant's car.

Defendant leaned toward the passenger seat of his car, as if reaching for something in the glove compartment or on the passenger seat. Don, La Fond, and several other people at the mall then heard a loud "pop." Officer Ganz leaned back, as if something had struck his upper body. He quickly moved backward toward the patrol vehicle in a crouched position. Defendant, armed with a firearm, got out of his car and followed approximately six to 12 feet behind Officer Ganz. When Officer Ganz was near the rear of his patrol vehicle, defendant shot him in the back. Officer Ganz either fell or dived behind the patrol vehicle. Defendant walked toward the back of the driver's side of the vehicle and, using both hands, fired again at a downward angle. He then moved back along the driver's side of the patrol vehicle, lowered his body for a few moments, stood up, returned to his car, and drove away. After Don heard defendant's car drive away, he used the police radio to call for help.

Several bystanders, including Robert Doyle and Jamie Timmons, came to Officer Ganz's aid. Timmons and another mall patron, David Thomas, also used the police radio to call for help.

Officer Ganz was lying facedown behind the patrol vehicle, with his right arm pinned beneath his body. He was making gurgling noises and was struggling to breathe and move. Timmons placed Officer Ganz's head in her lap to get him out of the puddle of blood that was choking him.

Officer Timothy Zins of the Manhattan Beach Police Department, who was on patrol two blocks away, responded to broadcasts requesting help. Within minutes, other officers arrived and secured the crime scene. Paramedics arrived, placed Officer Ganz in an ambulance, and transported him to a hospital, where he later died from his wounds.

About 1:00 a.m. on December 28, 1993, Detective Joseph Raffa of the Los Angeles County Sheriff's Department arrived at the crime scene. He recovered three spent shell casings; two were near the front of the patrol vehicle, and the other was near the driver's side. Detective Raffa contacted the bank located next to where Officer Ganz had stopped defendant and obtained a videotape from its security camera system. He likewise obtained the videotape from another nearby bank's security camera system.

After the shooting, numerous witnesses from the crime scene were transported to the police station and gave statements. Detective Delores Perales of the Los Angeles County Sheriff's Department and two other officers conducted the interviews. Don, La Fond, Doyle, Timmons, Thomas, David

Brumley (a passerby), David Sattler (who was in a nearby parking lot), and other witnesses described defendant, his car, and the events of that night.

Later that day, Solomon Riley, M.D., a deputy medical examiner for the Los Angeles County Department of Coroner, performed the autopsy. Officer Ganz had suffered two gunshot entry wounds. One bullet entered the right front side of Officer Ganz's upper chest, passed through the chest wall without entering the chest cavity, broke the bone in his right upper arm, and exited through the back of his right arm. The other bullet entered the left side of Officer Ganz's face slightly below his eye, fractured his orbital bone, grazed the front of the left half of his brain, crossed to the right side of his brain, grazed the middle portion of it, and lodged itself beneath his right ear. In Dr. Riley's opinion, such a wound would have rendered Officer Ganz unconscious in a matter of seconds; he would not have been able to run a distance of even 20 feet. In addition, Officer Ganz had a contusion on his back that was consistent with being shot in the back while wearing a bulletproof vest. Officer Ganz also had numerous abrasions on his skin that were consistent with his having fallen down, including a cluster of them on the right side of his forehead and another cluster on the back of his left hand. In Dr. Riley's opinion, Officer Ganz died from the gunshot wound to his head, but he could not determine which wound had been inflicted first.

The videotapes from the banks' security cameras were delivered to an institute affiliated with the National Institute of Justice. After analyzing the videotapes, the institute advised police investigators that defendant was driving a Daihatsu Charade. It also noted that defendant's car had sustained damage to its front right side.

The Los Angeles County Sheriff's Department established a "hotline" to receive information from the public. A tip received on January 20, 1994, implicated defendant and led to a police search, to which defendant consented, of defendant's bedroom, the common areas of his parents' condominium, and his car. This search did not disclose anything of evidentiary value.

In May of 1994, the investigating detectives showed Don and La Fond photographic lineups that included defendant's picture, but neither identified defendant as the shooter.

By April 1994, defendant and his parents had moved to Vancouver, Washington, just over the Oregon state line.

On August 4, 1994, Deputy John Landon of the Washington County Sheriff's Office in Oregon executed a search warrant on defendant's new

residence in connection with crimes committed in Oregon. Outside the residence was defendant's Daihatsu Charade, which had damage consistent with that on the car depicted in the banks' videotapes. Inside the residence, Deputy Landon discovered a locked fireproof box. Defendant's parents had never seen this box before and did not know how to open it.

On August 9, Deputy Larry McKinney of the Washington County Sheriff's Office obtained a warrant to open the box, which contained a semiautomatic .380-caliber handgun, two ammunition magazines, a box of .380-caliber ammunition, an envelope, two pairs of gloves, and a knit ski mask. Deputy Dwight Van Horn of the Los Angeles County Sheriff's Department then performed ballistics tests on defendant's and Officer Ganz's firearms and recovered a bullet from the back of Officer Ganz's bulletproof vest. Officer Van Horn determined the bullets recovered from Officer Ganz's body and bulletproof vest had been fired from defendant's firearm.

On August 13, La Fond identified defendant in a lineup as the shooter. Don had initially identified another person from the lineup, but identified defendant after speaking with one of the investigating detectives. In November 1995, Don went to Oregon to testify in related proceedings there, saw defendant (who was in custody), and identified him as the person who had shot Officer Ganz.

## 2. *Defense Evidence*

John Gruen, M.D., the director of neurotrauma at the Los Angeles County + University of Southern California Medical Center, has treated more than 100 patients with gunshot wounds to the head. Dr. Gruen reviewed Officer Ganz's medical records and Dr. Riley's report. In Dr. Gruen's opinion, Officer Ganz could have been shot in the face while standing next to defendant's car and then moved to the rear of his patrol vehicle before losing consciousness without leaving a trail of blood.

Detective Perales testified as to inconsistencies between the percipient witnesses' statements given immediately after the crime and their trial testimony. For example, contrary to his trial testimony, David Brumley originally told Detective Perales that he had heard four shots and did not mention seeing defendant get out of his car. And contrary to his trial testimony, David Sattler originally told Detective Perales that he was not facing defendant when he heard two shots and that, when he turned around, the patrol vehicle's driver's side door was closed; Sattler also failed to tell Detective Perales that he saw defendant standing in a "military style position"

over Officer Ganz and heard two more shots, and then saw defendant reach into the patrol vehicle, as if to use the radio.[3]

### 3. *Multiple-murder Special-circumstance Allegation*

At the trial on the multiple-murder special-circumstance allegation, the prosecution presented evidence that defendant had been convicted of aggravated murder in Oregon on November 2, 1995. (See p. 569, *post.*) The trial court took judicial notice of the fact that aggravated murder in Oregon was equivalent to first degree murder in California.

Defendant presented no evidence during this phase of the trial.

### B. *Discussion*

### 1. *Exclusion of Evidence of Third Party Culpability*

As noted, the Los Angeles County Sheriff's Department established a hotline to receive tips from the public concerning Officer Ganz's murder. Of the more than 2,000 clues that law enforcement received from the public and other sources (which were then numbered and catalogued), defendant sought to introduce five at trial: the one that implicated him (clue No. 1270); a confession (and subsequent recantation) made to a 911 operator on December 28, 1993 (clue No. 1796); the death of an Asian male who was killed shortly after Officer Ganz's murder when two Palos Verdes Estates police officers tried to apprehend him and were themselves killed in the attempt (clue No. 1506); reports that an associate of Jennifer La Fond "resembled" the person depicted in a composite drawing prepared by witnesses to the shooting (including La Fond) (clue No. 192); and an unsigned letter claiming responsibility for Officer Ganz's murder (no clue number). Prior to the start of defendant's trial, the trial court admitted the clue implicating defendant and excluded the remaining four clues on relevance grounds. During her guilt phase closing argument, the prosecutor noted there was no evidence suggesting that anyone other than defendant had committed Officer Ganz's murder. Defendant now contends the trial court erred by excluding evidence possibly implicating other suspects.[4]

---

[3] In rebuttal, the prosecution presented testimony from other proceedings wherein Brumley and Sattler had testified consistently with their testimony in defendant's trial.

[4] Defendant here and in a number of other claims urges that the error or misconduct he is asserting infringed various rights guaranteed by the federal and state Constitutions. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate

██ Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant. But evidence that 'another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime. (See *People v. Avila* (2006) 38 Cal.4th 491, 577–578 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Evidence that is relevant still may be excluded if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time. (See Evid. Code, § 352.)

We review for an abuse of discretion a trial court's exclusion of evidence. (*People v. Avila*, *supra*, 38 Cal.4th at pp. 577–578.) Applying this standard, we conclude the trial court did not abuse its discretion in excluding the four clues, as the proffered evidence suggested no link between the third parties and the actual perpetration of Officer Ganz's murder.

As to clue No. 1796, the caller who confessed to a 911 operator later recanted, and defendant made no showing that this third party had any connection to the commission of the crime other than this unsubstantiated and later withdrawn confession.

As to clue No. 1506, although several eyewitnesses to Officer Ganz's murder described the assailant as an Asian male and the clue referred to an Asian male who had killed two members of a nearby police department and was suspected of committing an armed robbery, no evidence implicated this person in Officer Ganz's murder. Although the man's ethnicity and his possible involvement in an unrelated robbery and killing of other police officers initially might have suggested some involvement in Officer Ganz's murder, defendant presented no evidence actually linking this person to Officer Ganz's murder. (See *People v. Page* (2008) 44 Cal.4th 1, 37 [79 Cal.Rptr.3d 4, 186 P.3d 395] [rejecting the defendant's claim of third party culpability, stating, "The flaw in defendant's theory is that the proffered evidence has no tendency to establish any relevant fact."].)

---

claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

As to clue No. 192, various individuals did tell the police that an associate of La Fond "resembled" the composite drawing, but none of the eyewitnesses (including, notably, La Fond) identified this third party as Officer Ganz's assailant, and La Fond stated that this third person was not involved with Officer Ganz's murder. Moreover, the trial court said it would revisit this matter if, for example, La Fond testified about this third person, but she did not, and defendant presented no evidence at trial about her associate.

Finally, the author of the unsigned letter that claimed responsibility for Officer Ganz's murder was never identified. Third party culpability evidence that does not identify a possible suspect is properly excluded. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 176–177 [14 Cal.Rptr.2d 342, 841 P.2d 862].)

Even were we to assume the trial court erred by excluding the proffered evidence, prejudice is lacking under either the state or federal standard of review. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The evidence of defendant's culpability was overwhelming: multiple eyewitnesses identified him as the shooter, ballistics tests indicated his handgun was used to shoot Officer Ganz, and videotapes from the scene of the crime showed a car of the same make and model as defendant's. In sum, defendant fails to establish entitlement to relief based on the trial court's exclusion of the evidence of the clues.[5]

### 2. *Exclusion of Evidence of Possible Bias in Key Witness's Testimony*

Defendant contends the trial court erred by excluding evidence indicating a possible bias on the part of Robert Doyle, a key prosecution witness. On the night of the murder, Doyle was in a nearby parking lot at the shopping mall. He observed what looked to be a "routine traffic stop." While talking to some other people, Doyle observed Officer Ganz get out of his patrol vehicle and walk toward defendant's car. Doyle heard a gunshot and looked at the source of the noise, defendant's car. He saw Officer Ganz running away and "being chased" by defendant. Doyle then saw defendant twice shoot Officer Ganz; for the second shot, defendant pointed his firearm down as if Officer Ganz

---

[5] To the extent defendant contends the proffered clues indicated a possible bias by the investigators (for failing to investigate possible other suspects), the clues were not relevant to proving a material fact regarding *defendant's* culpability. (See *People v. Hamilton* (2009) 45 Cal.4th 863, 913–914 [89 Cal.Rptr.3d 286, 200 P.3d 898] [witness's belief that the police should have investigated another suspect does not establish that that suspect was a viable one].) To the extent defendant contends the exclusion of this evidence violated his right to present a defense during the penalty phase, for the reasons stated, none of the proffered evidence created a lingering doubt by suggesting someone other than defendant was responsible for the murder. (See *id.* at pp. 911–916.)

was on the ground or crouching down. Doyle then observed defendant run back to his car. He tried to catch defendant's car, but then ran over to Officer Ganz to help him. Doyle saw Officer Ganz lying facedown with his arms trapped beneath his body. He raised Officer Ganz off the ground to prevent him from choking.

In the year preceding defendant's trial, Doyle pleaded no contest to committing a battery (§ 243, subd. (e)(1) [battery against a current or former spouse, fiancé or fiancée, coparent, cohabitant, or partner]) and was placed on misdemeanor summary probation. The trial court ruled Doyle's conviction did not reflect moral turpitude (and thus could not be a basis for impeachment) and precluded defendant from impeaching Doyle as to any possible bias he might have harbored due to his probationary status. Defendant contends Doyle's trial testimony differed significantly from his original statements to the police and that the trial court should have allowed him to argue to the jury that Doyle sought to curry favor with the district attorney's office by shaping his testimony to match its theory of the case.

■ Defendant's contention lacks merit. Cross-examination may expose facts from which jurors can appropriately draw inferences about the reliability of a witness, including the possibility of bias. The trial court, however, has wide latitude to restrict such cross-examination, and such testimony is properly barred unless the defendant can show the prohibited cross-examination would have produced a significantly different impression of the witness's credibility. (*People v. Smith* (2007) 40 Cal.4th 483, 513 [54 Cal.Rptr.3d 245, 150 P.3d 1224].) Defendant made no showing that Doyle actually had been offered leniency or threatened with retaliation by the prosecution. In fact, the trial prosecutor was not even aware Doyle was on probation until his criminal record was checked during the course of defendant's trial.[6] As such, defendant has failed to demonstrate that the prohibited cross-examination would have left the jury with a significantly different impression of Doyle's credibility. (*People v. Chatman* (2006) 38 Cal.4th 344, 374 [42 Cal.Rptr.3d 621, 133 P.3d 534].) Defendant's contention that the trial court violated his federal constitutional rights to present a defense and to confront witnesses similarly fails. (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 943.)

Even were we to assume the trial court erred in limiting defendant's ability to cross-examine Doyle, defendant fails to demonstrate prejudice under either the *Chapman* or *Watson* standard. (See *Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) The jury was

---

[6] The record also indicated Doyle pleaded no contest the day after he was arrested, which suggests his potential testimony in defendant's case was not a factor in the disposition of his own case.

made aware of Doyle's purportedly inconsistent statements through defense counsel's extensive cross-examination of Doyle and through the testimony of Detective Perales. Moreover, the evidence of defendant's culpability was overwhelming, as Doyle was but one of many eyewitnesses to the shooting.[7]

### 3. *Sufficiency of the Evidence to Support First Degree Murder Verdict*

Defendant contends there was insufficient evidence to support his conviction for first degree murder. At his trial, defendant argued to the jury that he "randomly fired" at Officer Ganz, which conduct would be insufficient to support the finding of premeditation and deliberation that is required for first degree murder.

The law is settled. In reviewing a criminal conviction challenged as lacking evidentiary support, the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. An appellate court must accept logical inferences the jury might have drawn from the evidence, even if the court would have concluded otherwise. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1014–1015 [81 Cal.Rptr.3d 299, 189 P.3d 300].) " 'The standard of review is the same when the prosecution relies mainly on circumstantial evidence.' " (*People v. Burney* (2009) 47 Cal.4th 203, 253 [97 Cal.Rptr.3d 348, 212 P.3d 639].)

■ A murder that is willful, deliberate, and premeditated is murder in the first degree. (§ 189.) " ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" ' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419 [64 Cal.Rptr.3d 721, 165 P.3d 512].)

■ " ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." [Citation.] A reviewing court normally considers three kinds of

---

[7] To the extent defendant contends the exclusion of this evidence violated his right to present mitigating evidence during the penalty phase, for the reasons stated, Doyle's probationary status was not mitigating evidence and did not create a lingering doubt, and the jury was aware of the inconsistencies in Doyle's various accounts of the murder. (See *People v. Hamilton, supra,* 45 Cal.4th at pp. 911–916.)

evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but "[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation." ' " (*People v. Burney, supra*, 47 Cal.4th at p. 235.) These three factors, however, are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive. (See, e.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1253 [57 Cal.Rptr.3d 543, 156 P.3d 1015]; *People v. Bolin* (1998) 18 Cal.4th 297, 331–332 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

As we will explain, the totality of the evidence is sufficient to support the jury's verdict.

### a. *Preexisting motive*

When Officer Ganz detained him, defendant had a firearm in his car, which was not only a violation of the terms of his federal supervised release, but also a crime. (See, e.g., § 12021, subd. (a)(1).) Discovery of defendant's firearm, therefore, could have led to defendant's arrest and incarceration.

Citing *People v. Cummings* (1993) 4 Cal.4th 1233, 1299–1300 [18 Cal.Rptr.2d 796, 850 P.2d 1], defendant contends there was no evidence to lead either him or an objective observer to believe his arrest for illegally possessing the firearm was highly likely or imminent, as this otherwise routine traffic stop was not the type of police contact likely to result in an arrest. *Cummings* is distinguishable, however, as it concerned the sufficiency of the evidence to support a special circumstance finding of murder committed for the purpose of preventing a lawful arrest. (See § 190.2, subd. (a)(5).) The issue in *Cummings*—the *imminence* of the arrest—simply is not relevant to whether the *possibility* of arrest supported an inference that defendant had premeditated and deliberated the killing of Officer Ganz. The evidence at trial demonstrated that, at the time of his detention, defendant was committing an act that could have resulted in his returning to prison. A rational trier of fact could have found defendant shot Officer Ganz to prevent him from discovering the firearm that would have led to defendant's incarceration. (See, e.g., *People v. Durham* (1969) 70 Cal.2d 171, 189 [74 Cal.Rptr. 262, 449 P.2d 198] [" ' "[K]nowing that they were all guilty . . . , it is easy to understand why they might take life before they would suffer themselves to be arrested, their crime found out, and the severe punishment meted out to them . . . ." ' "].)

Defendant contends he could not have harbored a preexisting motive to kill Officer Ganz because it would have been impossible for the officer to discover his firearm, as the circumstances of the traffic stop did not justify a

search of his car. Drivers, however, often keep the documentation necessary to operate a motor vehicle in the vehicle's glove compartment; it is not unheard of for a police officer to spot contraband when a driver opens the glove compartment to retrieve those documents. (E.g., *Maryland v. Pringle* (2003) 540 U.S. 366, 368 [157 L.Ed.2d 769, 124 S.Ct. 795]; see also *In re Arturo D.* (2002) 27 Cal.4th 60, 89 [115 Cal.Rptr.2d 581, 38 P.3d 433] (conc. & dis. opn. of Werdegar, J.).) Vehicles are also sometimes searched pursuant to a condition of supervised release, probation or parole, in an inventory search following an arrest, or for the safety of the police officer. (See, e.g., *People v. Walker* (1969) 273 Cal.App.2d 720, 724 [78 Cal.Rptr. 439] ["For his own protection the officer was justified in opening the glove compartment himself, rather than to risk the possibility that defendant would pull a weapon out of it."].) Regardless of whether any of those circumstances actually existed with respect to defendant's stop, a rational trier of fact could have found that defendant feared his firearm would be discovered and decided to use it before Officer Ganz became aware of its existence.[8]

### b. *Planning activity*

██ Defendant correctly notes there was no evidence of extensive planning or preparation, as only a few minutes passed between the time Officer Ganz first shined his patrol vehicle's spotlight on defendant's car and the shooting. But as defendant concedes, under California law premeditation and deliberation can occur in a brief period of time. (See, e.g., *People v. Halvorsen, supra,* 42 Cal.4th at p. 419.) The lack of evidence of extensive planning does not negate a finding of premeditation. (See *People v. Millwee* (1998) 18 Cal.4th 96, 134 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

██ Although defendant's interaction with Officer Ganz was brief, it was more than momentary. Officer Ganz twice instructed defendant to move his car out of the intersection, followed defendant into the mall parking lot, initiated a traffic stop, got out of his patrol vehicle, and then talked with defendant, all within the space of a few minutes. A rational trier of fact could have concluded defendant, knowing he illegally possessed a firearm, rapidly

---

[8] Although defendant previously had made a statement reflecting his animus toward law enforcement, and such evidence would be further evidence of a motive, it was not introduced until the penalty phase.

To the extent defendant challenges the sufficiency of the evidence supporting the special circumstance of committing murder to avoid a lawful arrest (§ 190.2, subd. (a)(5)), such a claim fails. (See *People v. Osband* (1996) 13 Cal.4th 622, 690–693 [55 Cal.Rptr.2d 26, 919 P.2d 640] [test for the sufficiency of a special circumstance finding is the same as that for a criminal conviction].) Defendant does not dispute that he was legally detained for committing a traffic infraction, and we conclude a rational trier of fact could have found that defendant was afraid the discovery of his firearm (and hence his arrest) was imminent. (See *People v. Cummings, supra,* 4 Cal.4th at pp. 1299–1301.)

and coldly formed the idea to kill Officer Ganz during the course of these events, and therefore acted after a period of reflection rather than on an unconsidered or rash impulse. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1249 [120 Cal.Rptr.2d 432, 47 P.3d 225]; see also *People v. Millwee, supra,* 18 Cal.4th at pp. 134–135 [the defendant arrived at the victim's house unarmed but could have thought about the use of lethal force while traveling there and then retrieving a stored rifle, deactivating the safety and chambering a live round].)

### c. *Manner of killing*

At trial, defendant argued that he lacked the requisite mental state when he attacked Officer Ganz, asserting that Officer Ganz had been fatally wounded by the first shot. The totality of the evidence presented, however, indicates defendant wanted to make certain Officer Ganz died. (See *People v. Bolin, supra,* 18 Cal.4th at pp. 332–333 [the killings took place within a few minutes of the victims' arrival and the evidence suggested rapid and purposeful planning in response to the potential consequences of his partner's carelessness].) Here, defendant did not merely fire one shot from his car and then flee; rather, he got out of his car, shot Officer Ganz again in the back as the officer was retreating, and then stood over the officer's prone body and fired a third shot while holding his firearm with two hands. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1080–1082 [119 Cal.Rptr.2d 859, 46 P.3d 335] [intent to kill was shown by the defendant's shooting the victim in a vital area from only a few feet away and then preventing a witness from calling an ambulance]; *People v. Mayfield* (1997) 14 Cal.4th 668, 767–768 [60 Cal.Rptr.2d 1, 928 P.2d 485] [gunshot fired at a victim's face was consistent with a preexisting intent to kill]; see also *People v. Hawkins* (1995) 10 Cal.4th 920, 956–957 [42 Cal.Rptr.2d 636, 897 P.2d 574] [shooting the victim in the back of the head in an "execution-style murder" was sufficient evidence of premeditation and deliberation despite minimal evidence of planning and motive].)

Defense counsel at trial did highlight the weaknesses of the prosecution's theory of the case: the witnesses not only contradicted each other on various points, but the testimony of several witnesses also contradicted statements they had originally given to the police; no shell casings were found near the rear of the police vehicle; defendant's medical expert testified it was possible for the fatal shot to the head to have been fired first; and Don and La Fond initially were unable to identify defendant as the shooter. On review, however, we do not reevaluate the credibility of witnesses or resolve factual conflicts; rather, we presume the existence of every fact in support of the verdict that reasonably could be inferred from the evidence. (See *People v. Burney, supra,* 47 Cal.4th at p. 253; *People v. Lindberg* (2008) 45 Cal.4th 1,

27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) Under that standard, the prosecution's evidence did support the verdict.

■ Citing *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], defendant contends the fact he twice shot Officer Ganz in a nonfatal manner negates the possibility of premeditation and deliberation because the multiple shots and immediate pursuit of Officer Ganz demonstrate an "explosion" of violence or an eruption of "animal fury." (See, e.g., *People v. Alcala* (1984) 36 Cal.3d 604, 625–627 [205 Cal.Rptr. 775, 685 P.2d 1126].) Not so. The manner of the shooting—approaching a prone victim, stopping over him, and then aiming—"shows a calculated design to ensure death rather than an unconsidered explosion of violence." (*People v. Horning* (2004) 34 Cal.4th 871, 902–903 [22 Cal.Rptr.3d 305, 102 P.3d 228].) The mere *possibility* of a contrary finding as to defendant's mental state does not warrant a reversal of the guilt judgment. (See *People v. Burney, supra,* 47 Cal.4th at p. 253.)

Defendant claims the evidence of intent to kill in this case is no stronger than in *People v. Ratliff* (1986) 41 Cal.3d 675, 695–696 [224 Cal.Rptr. 705, 715 P.2d 665], in which we reversed an attempted murder conviction. "However, as we explained in *People v. Arias* (1996) 13 Cal.4th 92 [51 Cal.Rptr.2d 770, 913 P.2d 980], in *Ratliff,* we simply held that the 'evidence of intent to kill was not so conclusive as to render harmless an erroneous *failure to instruct* on that issue.' " (*People v. Avila* (2009) 46 Cal.4th 680, 702, fn. 7 [94 Cal.Rptr.3d 699, 208 P.3d 634].) Unlike *Ratliff,* the trial court here properly instructed the jury on the mental state required for first degree murder, and defendant does not contend otherwise.

### 4. *Asserted* Griffin *Error*

Defendant contends the prosecutor improperly commented on his silence during her closing argument, when she said: "Now, the next issue . . . is the issue of identity. As you realize, the defense did not appear to refute the issue of identity." At a sidebar conference, defendant moved for a mistrial, which the trial court denied. The prosecutor continued: "As I indicated, you heard all the evidence that's been presented in this case. And other than the questioning of witnesses that were presented, there was not any evidence presented to suggest that anyone other than the defendant committed this crime."

■ "[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 85 S.Ct. 1229].) The prosecutor's argument cannot refer to the absence

of evidence that only the defendant's testimony could provide. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1266 [32 Cal.Rptr.3d 838, 117 P.3d 544].) The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1304 [96 Cal.Rptr.3d 512, 210 P.3d 1119].)

Defendant relies on *People v. Northern* (1967) 256 Cal.App.2d 28 [64 Cal.Rptr. 15], in which the Court of Appeal ruled the prosecutor violated *Griffin* by arguing the evidence presented therein " 'has not been refuted by the Defendant.' " (*Id.* at p. 30, italics omitted.) The *Northern* court noted it was difficult to interpret the prosecutor's argument "as anything except a direct reference to defendant's failure to take the witness stand" (*id.* at pp. 30–31), as the defendant had committed two hand-to-hand narcotics transactions with an undercover police officer. Although defendant here contends his counsel "did everything possible to refute the identification *short of calling* [defendant] *to the stand*," this simply is not true. Defense counsel did extensively cross-examine the prosecution's witnesses, but defendant presented no alibi witnesses, no witnesses identifying someone else as the shooter (or the owner of the murder weapon at the time of the shooting), and no expert witnesses refuting either the identification of his car on the banks' security videotapes or the ballistics match between his firearm and the recovered bullets. If defendant had evidence relevant to the identity of Officer Ganz's murderer, he could have presented it in numerous ways without testifying. The prosecutor's comments, rather than being a direct (or even indirect) reference to defendant's silence, constituted reasonable comment on defendant's failure to introduce material evidence or logical witnesses. (Cf. *People v. Vargas* (1973) 9 Cal.3d 470, 475–477 [108 Cal.Rptr. 15, 509 P.2d 959].)

Even were we to assume the prosecutor improperly commented on defendant's silence, defendant suffered no prejudice. The evidence of defendant's identity was overwhelming: in addition to eyewitnesses identifying him as the shooter, his firearm was linked to the crime. Any assumed error was harmless beyond a reasonable doubt.[9] (See *People v. Turner* (2004) 34 Cal.4th 406, 420–421 [20 Cal.Rptr.3d 182, 99 P.3d 505] [prosecutor's closing argument about his inability to have a psychiatrist examine the defendant was not *Griffin* error; any assumed *Griffin* error was harmless beyond a reasonable doubt].)

---

[9] In addition, the trial court instructed the jury not to draw an inference from defendant's decision not to testify, and we presume the jurors understood and applied the instruction. (See, e.g., *People v. Butler* (2009) 46 Cal.4th 847, 873 [95 Cal.Rptr.3d 376, 209 P.3d 596].)

### 5. Jury Instruction on Consciousness of Guilt

Defendant contends the trial court erred in instructing the jury, at the request of the prosecution and over his objection, that it could consider his flight after Officer Ganz's shooting as evidence of his guilt.[10]

Here, defendant claims, the instruction unfairly highlighted facts favorable to the prosecution and invited the jury to draw a favorable inference from this evidence, which allowed the jury to infer from his departure from the crime scene that he harbored the requisite mental state at the time of the shooting. As defendant concedes, we previously have rejected similar claims, and we do so again here. (*People v. Morgan* (2007) 42 Cal.4th 593, 620–621 [67 Cal.Rptr.3d 753, 170 P.3d 129]; *People v. Boyette* (2002) 29 Cal.4th 381, 438–439 [127 Cal.Rptr.2d 544, 58 P.3d 391]; see *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190] [rejecting a similar challenge to a jury instruction regarding consideration of false statements as evidence of consciousness of guilt].)

### II. Penalty Phase and Posttrial Issues

#### A. Facts

##### 1. Prosecution Evidence

Over the course of 12 days, more than 60 witnesses testified during the prosecutor's case in aggravation. Many testified about the impact Officer Ganz's murder had on them; others were the victims of defendant's other offenses. The prosecution also introduced a videotape of Officer Ganz celebrating Christmas with family members and a videotape depicting portions of his memorial and funeral services.

###### a. Prior criminal activity (§ 190.3, factors (b), (c))

On October 14, 1986, defendant took some juice from a market in Santa Monica without paying for it. When confronted by Khosrow Hakimian, one of the owners, defendant pushed his arm aside to get away.

From August to October of 1989, defendant robbed six banks in the Los Angeles area and attempted to commit two additional bank robberies. With

---

[10] The court instructed the jury in accordance with CALJIC No. 2.52, stating: "[T]he flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

each robbery, defendant demanded money from a teller; he usually would then display, and sometimes brandish, a firearm that he carried tucked into his waistband.

Defendant finally was apprehended on October 12, 1989, when Deputy Christopher Germann of the Los Angeles County Sheriff's Department heard a police radio broadcast regarding one of the bank robberies that had occurred that day. Deputy Germann spotted defendant's car, followed him, and then attempted to pull him over, but defendant sped away. Defendant eventually drove up the long, dead-end driveway of his own residence (his parents' home) and fled on foot into the undeveloped hillside. Deputies apprehended and subdued defendant, who had in his possession numerous bills with serial numbers that matched those on the bait money from the bank that had been robbed earlier that day. A search of defendant's car revealed a BB gun on the floorboard of the driver's seat. While receiving medical attention, defendant said something along the lines of "I should have shot it out with you guys. I should have gone for it." When Deputy Germann pointed out that he had only a BB gun, defendant replied that next time it would not be just a BB gun.

Defendant was charged in federal court with six counts of bank robbery and ultimately pleaded guilty to two counts of bank robbery. Defendant told his probation officer that he committed the robberies because he was addicted to crack cocaine and also needed to pay his living expenses.

On October 15, 1993, Phillip Brown, a security guard at defendant's parents' residence, issued him a parking ticket. Defendant told Brown that if he had had his knife with him, he would have "juked" him. Brown understood this to mean defendant would have stabbed him, but he did not take defendant seriously.

From October to December of 1993, defendant robbed five supermarkets in a chain of grocery stores in the Los Angeles area. Each robbery occurred in the early morning hours when employees were transferring cash from the registers to the manager's office. While wearing an obviously fake wig, defendant approached the employees, brandished a firearm, and demanded money.

From April to July of 1994, defendant robbed five supermarkets in a chain of grocery stores near the Washington-Oregon border. Defendant usually wore a long coat and a dark ski mask that covered all but his eyes and the center portion of his face. Defendant demanded money from a checker and then would usually display, and sometimes brandish, a firearm that he carried tucked into his waistband.

During this period, defendant also robbed a pharmacy. Brandishing a firearm, defendant said, "This is a robbery," and then demanded a number of specific drugs, and money. During this robbery, defendant inadvertently dropped some ammunition, which was analyzed and determined to match the ammunition recovered from his parents' residence.

The prosecution introduced evidence of a homicide in Oregon defendant committed after having robbed another grocery store. On August 3, 1994, defendant robbed a supermarket wearing a long coat, gloves, and a black ski mask that covered most of his face. Defendant demanded money from a checker, pulled a .380-caliber pistol from his pocket, and took money from the register while pointing the pistol at the checker. Defendant then left the market and headed toward a side parking lot. As defendant rounded the corner, Catalina Correa (who had been in the market just prior to the robbery) turned and faced him. Defendant shot Correa three times, killing her. Defendant then got into his car and drove off. Andrew Dickson, who was in his van, followed defendant's car; defendant stopped, got out of his car, and shot at Dickson but hit only the van. Defendant was apprehended the next day. The police then searched defendant's parents' residence and found, in addition to the previously mentioned locked box and its contents, two wigs, an assault rifle, and ammunition for that rifle. Thomas Jenkins, a criminalist with the Oregon State Police, examined the bullets and casings from this shooting and determined Correa had been shot with defendant's .380-caliber pistol and Dickson had been shot at by defendant's assault rifle.

### b. *Victim impact testimony*

#### i. *Officer Ganz (§ 190.3, factor (a))*

Officer Ganz, who came from a large, impoverished family, had wanted to be a police officer since he was 12 years old. After graduating from high school, he joined the Marines so he could become a military police officer. While a Marine, he rescued a man from a burning truck and was honored for saving the man's life.

In 1988, Officer Ganz was hired by the Manhattan Beach Police Department in a civilian position to promote seatbelt awareness. He became a sworn police officer in 1989 and was assigned to motorcycle duty. He was a well-respected, well-liked officer who regularly volunteered for assignments and had received numerous letters of commendation from members of the community.

Officer Ganz was very close to his seven sisters (one of whom died at a very young age), and he often provided them with emotional and financial

support. He played a significant role in helping raise the two children (including Don, his godson) of his sister Rachael Ganz-Williams, a single mother. He worked on Christmas Eve (just a few days before he was shot) so other officers could be with their families, but once his shift was over, he went to a sister's house to celebrate Christmas morning with her and her children. The jury viewed a portion of a videotape depicting that celebration.

Officer Ganz was engaged to marry Pamela Magdaleno. He had purchased a home and was in the process of remodeling it in anticipation of his married life. Magdaleno had asked Officer Ganz not to work the night he was murdered, but he refused her request, as it was the last opportunity he had to take Don on a ride along. During his shift, Officer Ganz telephoned Magdaleno to tell her he loved her. After learning about Officer Ganz's death, Magdaleno said it "felt like someone had stuck their hand into my chest and ripped my heart out."

Officers Karl Nilsson and Neal O'Gilvy of the Manhattan Beach Police Department, both close friends of Officer Ganz, were on duty that night and responded immediately to radio broadcasts of the shooting. Officer O'Gilvy attempted to contact Officer Ganz by radio to determine whether he was the officer who had been shot. Both officers described, in detail, the injuries Officer Ganz had sustained and the efforts of the paramedics to save his life. Officer Nilsson held Officer Ganz while waiting for the paramedics to arrive. Officer Nilsson allowed Officer O'Gilvy to ride in the ambulance with Officer Ganz, and O'Gilvy stayed by his side while at the hospital. Other officers arrived at the hospital and urged the staff to continue to work on Officer Ganz even after he had been declared dead. Officer O'Gilvy broke down emotionally. He then made telephone calls letting people know Officer Ganz had fought to the very end. Officer O'Gilvy stayed with Officer Ganz after he died, insisted his body not be transported to the coroner's office by itself, and arranged for another officer to accompany the body. Dozens, if not hundreds, of officers from other law enforcement jurisdictions helped secure the crime scene and otherwise assisted and supported the Manhattan Beach Police Department.

Several witnesses described Officer Ganz's funeral, and the jury viewed a videotape of portions of the church services and graveside ceremonies. Officer Ganz's funeral was attended by over 4,000 people, many of whom were police officers in full dress uniform; the procession stretched for several miles. Officer Ganz's mother was too distraught to attend either the memorial service or the funeral, and she died six months after he did.

After Officer Ganz's death, the Manhattan Beach Police Department contacted a psychologist who specialized in trauma intervention. Officer

Nilsson lost sleep, drank too much, had a romantic relationship fail, and was demoted due to mood changes resulting from Officer Ganz's death. Officer O'Gilvy became unproductive and often cried in his patrol vehicle. Police Chief Ted Mertens believed that several officers still relived the events of Officer Ganz's shooting on an almost daily basis; it had made them more cautious.

### ii. Other victims (§ 190.3, factor (b))

Approximately three dozen people who witnessed defendant's robberies testified about their experiences, and many of them described the impact his actions had on their lives. For example, Ricardo Gutierrez feared retaliation when he identified defendant as the robber of his supermarket, and feared he could be robbed again. Cindy Ettestad did not return for a long time to the supermarket that was robbed while she was there; she had nightmares and was unable to watch movies depicting people wearing ski masks. Arden Schoenborn, the supermarket checker whom defendant robbed on the day he murdered Catalina Correa, quit his job after the robbery due to the stress of wondering whether someone else might point a loaded gun at him. Kay Heinzman, a technician at the Oregon pharmacy, stated she had "lost a year" of her life, was unable to work following the robbery, and was so traumatized by testifying she nearly was unable to identify defendant as the robber.

### 2. Defense Evidence

Defendant was born in Vietnam in 1965 to a Vietnamese mother and an American father. Defendant's mother, Diep Brady (Diep), worked on a vegetable farm and later as a clerk to support her siblings, as her father had died when she was 12 years old. Both of Diep's brothers joined the South Vietnamese Army, and they introduced Diep to Phillip Brady (Phillip), defendant's father, who was a Marine advising the South Vietnamese military.

Phillip and one of Diep's brothers fought together in a battle in which the brother was killed. Phillip contacted Diep so she could retrieve her brother's belongings, and soon thereafter they started to date.

Due to an illness, Phillip was sent to Japan and eventually to the United States. During this time, defendant was born. Phillip, now working for the CIA through an aid agency, returned to Vietnam when defendant was eight months old. Phillip, Diep, and defendant lived in a security compound in the countryside while the war was waged all around them; the compound was attacked several times. Defendant was the only child there. By the time defendant was two and a half years old, he could point to and identify North Vietnamese soldiers.

Defendant's family moved to another security compound near the Cambodian border, which was close to the worst part of the fighting. Defendant was again the only child there; he frequently saw soldiers being killed. When defendant was three and a half years old, he was evacuated in a helicopter. While men operated machine guns on either side, defendant pointed out enemy soldiers to them.

Around 1969, Phillip was offered a job with a news organization, so defendant and his parents moved to New York. Diep was unhappy in New York, so they moved back to Vietnam. While in Vietnam, Phillip suffered from flashbacks and extensively used drugs and alcohol. Phillip filed a news report that the Vietnamese government did not like, so he was forced to leave the country and the family relocated to Hong Kong. Phillip often was away on assignment in Cambodia or Afghanistan.

After a few years, defendant's family moved to New Jersey, and later to Venice, California. Phillip was not working and continued to use drugs and alcohol. Diep, defendant, and his sister moved in with Diep's mother, who had relocated to the area from Vietnam. Defendant's parents initiated divorce proceedings but ultimately reconciled. During this period, defendant stopped going to school and ran away, and Phillip showed little interest in him.

Around 1977, defendant's family bought a home in a remote area of Topanga, California. Phillip began to cultivate marijuana and instructed defendant to water the plants. Phillip was arrested for growing marijuana.

Due to the isolation of their house, defendant had no friends in the area and was shy and withdrawn. He lived in a dark room underneath the house while the rest of the family lived upstairs. Defendant often was home alone and had to get to school by himself. Phillip had very high expectations for defendant and favored his sister over him.

During this time, Phillip's drug and alcohol use continued. At the age of 12 or 13, defendant began to use marijuana.

Phillip was physically abusive with Diep and defendant. On one occasion, Diep called out for defendant to help her, but defendant did not respond, knowing there was nothing he could do to stop Phillip.

After graduating from high school, defendant wanted to join the military. Phillip opposed the idea and told defendant he was too weak to be in the military. Defendant instead attended a local community college.

After defendant was convicted of the bank robberies, Phillip visited him in prison twice a month. When he was released, defendant entered a drug

rehabilitation program. Defendant lived alone for a while after his release, but Phillip feigned illness to convince him that he was needed at home. Phillip then made defendant drive to drug dealers for him. Defendant's parents fought constantly, and he told Diep and his probation officer that he would rather be back in prison. During this time, defendant once failed to appear for mandatory drug testing, blaming his absence on an argument he had had with Phillip. While on supervised release, defendant never tested positive for drugs.

Diep, defendant's sister, and his cousin each testified about how much they cared for him.

Neuropsychologist Lorie Humphrey, Ph.D., examined defendant and determined he had possible right-side brain damage. Defendant had good language skills, but was poor at naming objects and at visually perceiving and processing information. Defendant's neurocognitive problems may have affected his perception of society, his socialization, his ability to form relationships or show emotion, and his ability to hold a job. In Dr. Humphrey's opinion, such individuals function optimally in highly structured environments.

Dr. Humphrey administered the Minnesota Multiphasic Personality Inventory (MMPI) test to defendant, and on cross-examination she conceded the results indicated he had a high degree of anger and potential for explosive behavior and often blamed others for his problems. Defendant's MMPI results matched those of the most difficult criminal offenders, who often have problems adjusting to prison life.

B. *Discussion*

1. *Victim Impact Evidence*

a. *Evidence relating to Officer Ganz*

Over objection, four of Officer Ganz's sisters, his fiancée, the treating physician at the hospital, two fellow officers, and his police chief testified during the penalty phase; their testimony spanned several hours over two days. They described Officer Ganz's childhood hardships, his lifelong desire to be a police officer, his achievements, his engagement and future plans, his death, his funeral service, and the aftereffects of his death. The jury also viewed two videotapes and numerous photographs, and received other evidence memorializing Officer Ganz's achievements.

Prior to the start of the penalty phase, defendant filed a motion to limit the scope and amount of victim impact evidence; he also made several evidentiary objections during the penalty phase. At various points, the trial court

excluded from evidence photographs of Officer Ganz as a child, photographs of Don, an animated reenactment of the crime, and a poster captioned "In Memory" that displayed the funeral program and photographs of the crime scene, Officer Ganz's motorcycle helmet and gloves, the funeral, his gravestone, the Manhattan Beach police station, and the national police officers' memorial in Washington, D.C.

Defendant contends the trial court erred by admitting the victim impact evidence, asserting much of the evidence regarding Officer Ganz was excessive, inflammatory, irrelevant, and unduly prejudicial. He complains the proceedings effectively acted as an "extended memorial service" and "more closely resembled a wake" for the officer than a criminal trial.[11]

■ Unless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the community is relevant and admissible under section 190.3, factor (a) as a circumstance of the crime. (E.g., *People v. Burney, supra,* 47 Cal.4th at p. 258.) The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. (*Burney,* at p. 258, citing *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].)

### i. *Courtroom testimony*

As noted, during the penalty phase Officers Karl Nilsson and Neal O'Gilvy testified extensively about how they learned of the shooting, their initial reactions to learning that the downed officer was their friend Officer Ganz, the efforts to save his life both at the scene and at the hospital, their immediate reaction to his death, and the effect his death had on their lives. Defendant characterizes their testimony as "emotional," "not objective," and of doubtful accuracy,[12] and observes Officer O'Gilvy, who was the prosecution's final witness, broke down on the stand, which meant the jury was left to contemplate this "dramatic" testimony until the trial resumed the next day.

---

[11] Defendant's contentions notwithstanding, we continue to reject the previously rejected claims that (1) victim impact evidence deprives defendants of a state-created liberty interest (e.g., *People v. Boyette, supra,* 29 Cal.4th at p. 445, fn. 12); (2) "circumstances of the crime," as used in section 190.3, factor (a) is unconstitutionally vague, overbroad, subject to arbitrary decisionmaking, or fails to provide adequate notice (e.g., *People v. Carrington* (2009) 47 Cal.4th 145, 197 [97 Cal.Rptr.3d 117, 211 P.3d 617]); and (3) victim impact evidence must be limited to the circumstances known to the defendant at the time of the commission of the crime (e.g., *id.* at pp. 196–197). Rather, "circumstances" in this context extends to that which "materially, morally, or logically" surrounds the crime. (*People v. Hamilton, supra,* 45 Cal.4th at p. 926.)

[12] The trial court properly instructed the jury that the jury was the sole judge as to the believability of the witnesses and that discrepancies may occur in witnesses' testimony. We

Defendant contends the testimony of these officers should have been excluded as inflammatory and cumulative to the guilt phase testimony. In support, he cites *People v. Love* (1960) 53 Cal.2d 843 [3 Cal.Rptr. 665, 350 P.2d 705], in which we reversed a death judgment. In *Love*, the jury saw a photograph of the murder victim lying dead on a hospital table; the photograph showed the expression of her face in death. The jury also heard a tape recording taken in the emergency room shortly before the victim's death in which she recounted the facts of how she was shot. The victim's doctor testified that she was in extreme pain before she died. As the jury already was aware of the facts of the shooting and the painfulness of her death, we reasoned the sole purpose of the tape recording and photograph was for the jury to hear the victim's groans and failing voice and to see her expression as she died. (*Id.* at pp. 854–855.) We held this evidence was unduly inflammatory, as it tended only to prove facts already known to the jury and was of limited probative value in determining the defendant's sentence. (*Id.* at pp. 856–857.)

■ *Love* predates the high court's ruling in *Payne v. Tennessee, supra,* 501 U.S. 808, and the enactment of section 190.3, both of which expressly allow the jury to consider the circumstances of the crime—including its immediate injurious impact—as an aggravating factor.[13] (E.g., *People v. Harris* (2005) 37 Cal.4th 310, 351–352 [33 Cal.Rptr.3d 509, 118 P.3d 545].) Nonetheless, defendant contends Officer O'Gilvy's "dramatic deathbed story told by a distraught friend and fellow police officer" was more inflammatory than the photograph and tape recording in *Love* and therefore prejudicial. We disagree. Emotional testimony is not necessarily inflammatory. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 298–299 [finding no error when the victim's mother cried while testifying]; *People v. Jurado* (2006) 38 Cal.4th 72, 132–134 [41 Cal.Rptr.3d 319, 131 P.3d 400] [finding no error when testimony from multiple family members caused some jurors to cry].) When exercising discretion in admitting emotionally laden evidence, however, courts must monitor the effect of the evidence on the jury and audience members and make a careful record of their observations. (See *People v. Prince, supra,* 40

presume the jury followed these instructions (see, e.g., *People v. Butler, supra,* 46 Cal.4th at p. 873), and it is not the role of an appellate court to assess a witness's credibility.

[13] In the intervening years, we have upheld the admission of photographs similar to those at issue in *People v. Love, supra,* 53 Cal.2d 843. (E.g., *People v. Salcido* (2008) 44 Cal.4th 93, 146–148 [79 Cal.Rptr.3d 54, 186 P.3d 437] [photographic evidence was admitted during the penalty phase to support the prosecutor's theory suggesting sexual misconduct with the victims, despite the jury's already having heard testimony on the subject].) We also have upheld the admission of a 911 tape wherein a 16-year-old girl reported that two men had just entered her house and shot both her and her mother in the back of the head. The girl survived the attack but could be heard screaming hysterically when she discovered her mother's body. (*People v. Hawthorne* (2009) 46 Cal.4th 67, 101–103 [92 Cal.Rptr.3d 330, 205 P.3d 245].)

Cal.4th at pp. 1289–1290.) The trial court here did so; it noted, for example, that audience members had reacted emotionally to some of the victim impact evidence.

As the officers' testimony did not invite a purely irrational response or otherwise render defendant's trial fundamentally unfair (see *People v. Burney*, *supra*, 47 Cal.4th at p. 258), the trial court did not abuse its discretion in permitting the officers to testify. To the extent defendant further contends that particular portions of the officers' courtroom testimony were overly emotional and thus prejudicially inflammatory, defendant did not object nor did he request the trial court to give the witnesses some time to compose themselves, consequently forfeiting the issue on appeal. (See Evid. Code, § 353, subd. (a); see, e.g., *People v. Robinson* (2005) 37 Cal.4th 592, 652 [36 Cal.Rptr.3d 760, 124 P.3d 363].)

Defendant also relies on *People v. Edwards* (1991) 54 Cal.3d 787 [1 Cal.Rptr.2d 696, 819 P.2d 436]. Although in *Edwards* we cautioned against prosecutors' employing inflammatory evidence and arguments, we ultimately ruled the evidence presented and the prosecutor's argument in that case were not unduly inflammatory. (*Id.* at pp. 832–836, 839–840.) We reached a similar conclusion in *People v. Haskett* (1982) 30 Cal.3d 841, 859, 863–864 [180 Cal.Rptr. 640, 640 P.2d 776], another case upon which defendant relies.

Defendant contends the officers' testimony was cumulative. Their testimony in some respects did repeat information already known to the jury, such as the discovery of Officer Ganz at the crime scene, his condition, Jamie Timmons's holding his head in her lap to prevent him from choking on his own blood, and the medical response. This repetition, however, comprised a comparatively small amount of the officers' total testimony and is not unusual when multiple witnesses testify about the same event. Moreover, during the officers' testimony, trial counsel did not object to any specific portion as being cumulative, and thus the issue is forfeited on appeal. (E.g., *People v. Robinson, supra*, 37 Cal.4th at p. 652.)

Defendant next contends the evidence about Officer Ganz's character provided by his family was excessive and inflammatory. In support, he cites *People v. Roldan* (2005) 35 Cal.4th 646, 731–733 [27 Cal.Rptr.3d 360, 110 P.3d 289], in which we upheld the admission of the victim impact evidence, but noted such evidence was limited to a single photograph of the victim with his children and one witness whose testimony was "relatively short and subdued" (*id.* at p. 732); the trial court in *Roldan* (unlike the trial court in this case) had excluded a videotape prepared by the victim's widow and evidence of awards the victim received for his community service and heroism. Although the victim impact evidence presented in this case was

more extensive than that presented in *Roldan,* the evidence here cannot be fairly characterized as inflammatory, as it did not divert the jury from the task at hand. (See *Roldan,* at p. 732.) For example, although the jury heard some testimony about Officer Ganz's childhood, it was brief and provided context for the testimony regarding his lifelong desire to become a police officer.

Defendant relies upon cases from other jurisdictions that have limited the scope and quantity of victim impact evidence. (*Conover v. State* (Okla.Crim.App. 1997) 933 P.2d 904, 918–923; *Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330, 335–339; see *State v. Dennis* (1997) 79 Ohio St.3d 421 [1997 Ohio 372, 683 N.E.2d 1096, 1107] [admission of a mother's statements eulogizing the accomplishments and character of the victim was harmless error]; *Cargle v. State* (1995) 1995 OKCR 77 [909 P.2d 806, 824–830] [admission of the amount and type of victim impact evidence was harmless error].) These cases are not binding on this court. The jury here heard traditional victim impact evidence: family members and friends extolled Officer Ganz's virtues and demonstrated they missed him. Neither the type nor the amount of evidence warrants reversal. (See *People v. Huggins* (2006) 38 Cal.4th 175, 236–238 [41 Cal.Rptr.3d 593, 131 P.3d 995] [finding no error when multiple witnesses testified about the victim's character and the loss felt by family members and the community, including testimony about the erection of a statue of the victim]; *People v. Jurado, supra,* 38 Cal.4th at pp. 132–134 [finding no error when testimony from multiple family members caused some jurors to cry].)

Defendant also contends two family members improperly testified about the effect of Officer Ganz's murder. Don's mother, Rachael Ganz-Williams, testified Don opted not to testify during the penalty phase because he "just couldn't do it." The testimony about Don was appropriate to dispel any potential negative implication that might be drawn from the prosecutor's failure to call him as a witness. (*People v. Carrington, supra,* 47 Cal.4th at p. 197.) Defendant's inability to cross-examine Don about the impact of the murder did not render the testimony inadmissible. (See, e.g., *People v. Jurado, supra,* 38 Cal.4th at pp. 132–134 [family members testified about the effect of the crime on other family members who did not testify].) Accordingly, the trial court properly instructed the jury that it could consider the impact of the murder on the victim's family as a circumstance of the offense. (See *id.* at pp. 130–131; cf. *People v. Panah* (2005) 35 Cal.4th 395, 495 [25 Cal.Rptr.3d 672, 107 P.3d 790] [finding no error in the admission of victim impact evidence given that the trial court instructed the jury it could " 'consider only such harm as was *directly caused* by defendant's act' " (italics added)].)

In addition, over objection, another of Officer Ganz's sisters testified that their mother "gave up on life" and died six months after his murder. Although

this testimony explained their mother's absence, it also constituted improper speculation as to the possible effect of Officer Ganz's death on their mother's health. (See *People v. Carrington, supra,* 47 Cal.4th at p. 197.) Defendant, however, fails to demonstrate prejudice because there is no reasonable likelihood this error affected the penalty phase verdict. (See, e.g., *People v. Lewis* (2008) 43 Cal.4th 415, 500 [75 Cal.Rptr.3d 588, 181 P.3d 947].)

■ Defendant further contends the trial court improperly admitted evidence regarding the effect of Officer Ganz's murder on his professional community, that is, the Manhattan Beach Police Department. Victim impact evidence, however, is not limited to family members, but may include the effects on the victim's friends, coworkers, and the community—including when the victim's coworkers are law enforcement personnel. (*People v. Ervine* (2009) 47 Cal.4th 745, 792–794 [102 Cal.Rptr.3d 786, 220 P.3d 820]; see also *id.* at pp. 793–794, fn. 17 [noting the defendant's reliance on *Lambert v. State* (Ind. 1996) 675 N.E.2d 1060 was "misplaced" because, unlike Cal. law, Ind. law at the time of the trial in that case did not include the circumstances of the crime as an aggravating factor]; e.g., *People v. Taylor* (2010) 48 Cal.4th 574, 644–647 [108 Cal.Rptr.3d 87, 229 P.3d 12] [allowing evidence of the loss felt by the staff and children at an afterschool program at which the victim volunteered].)

Defendant finally contends victim impact evidence must be limited to understandable human reactions (see *People v. Brown* (2004) 33 Cal.4th 382, 398 [15 Cal.Rptr.3d 624, 93 P.3d 244]), whereas the reactions of Officer Nilsson, Officer O'Gilvy, and Pamela Magdaleno to Officer Ganz's death reflected "severe maladjustment and psychopathological states" "demonstrating varying degrees of mental illness." Officer Ganz was Magdaleno's fiancé and Officers Nilsson's and O'Gilvy's friend and fellow officer who was murdered while on duty; the severity of their grief—and how that grief manifested itself—was well within the spectrum of human responses. (See *People v. Ervine, supra,* 47 Cal.4th at pp. 792–793.)

ii. *Video evidence*

■ Trial courts must be cautious about admitting victim impact evidence by way of videotape or other visual or auditory aids. (E.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1240 [96 Cal.Rptr.3d 574, 210 P.3d 1171].) In particular, trial courts must be cautious about admitting " 'lengthy' videotapes." (*Ibid.*) Here, the trial court admitted two videotapes that, together, were approximately 10 minutes long. Although length alone is not dispositive, we have upheld the admission of longer videotapes. (*Ibid.* [citing cases].) The trial court properly informed its exercise of discretion by viewing the videotapes before allowing the jury to view them, and we have done likewise. We discuss each videotape.

## (a) *Christmas*

The jury viewed a four-minute, edited videotape depicting Officer Ganz celebrating Christmas, two days before his murder, with his family. It consisted primarily of Officer Ganz handing out presents to one of his sisters and some of his young nieces and nephews, who excitedly opened the gifts. At one point, Officer Ganz and his sister hug.

This videotape depicted a rather ordinary event—a family holiday celebration. It is a brief "home movie" that depicted real events; it was not enhanced by narration, background music, or visual techniques designed to generate emotion; and it did not convey outrage or call for vengeance or sympathy. Like the videotape of the family trip to an amusement park we ruled admissible in *People v. Dykes* (2009) 46 Cal.4th 731, 783–785 [95 Cal.Rptr.3d 78, 209 P.3d 1], it humanized Officer Ganz and provided some sense of the loss suffered by his family, and it supplemented but did not duplicate their testimony. (Accord, *State v. Gray* (Mo. 1994) 887 S.W.2d 369, 389.) As such, the trial court did not abuse its discretion in admitting it.

## (b) *Memorial and funeral services*

The jury also viewed a six-minute, edited videotape highlighting Officer Ganz's memorial and funeral services.[14] The videotape began with Officer Ganz's casket draped in an American flag and with his officer's peaked cap on top of it; the casket was near a church chancel and numerous uniformed officers filed in and sat down. The officers then were seen leaving the church, and the casket was escorted out of the church and into a hearse. Next was an overhead shot of the funeral procession, which included numerous police motorcycles. The procession arrived at the gravesite, and Officer Ganz's mother refused to get out of her vehicle. Officer Ganz's police motorcycle, towed in a trailer, then arrived. There were several shots of various people crying, including a Marine in full dress uniform, who was Officer Ganz's best friend. A bagpiper led the procession to the gravesite, and numerous officers saluted the casket as it passed. An honor guard folded the American flag and

---

[14] Defendant also contends the witnesses' testimony about Officer Ganz's funeral was prejudicial and irrelevant. For example, one of Officer Ganz's sisters and his fiancée briefly discussed their role in arranging his funeral. Evidence of the emotional and financial cost involved in planning and attending a funeral is relevant and admissible as circumstances of the crime. (*People v. Harris, supra,* 37 Cal.4th at pp. 328, 351–352; see *People v. Dykes, supra,* 46 Cal.4th at p. 780 ["moving" description of ordering the victim's casket].) Moreover, defendant never objected to witnesses testifying about Officer Ganz's funeral and thus has forfeited this claim on appeal. (E.g., *People v. Robinson, supra,* 37 Cal.4th at p. 652.) In addition, videotape and photographic evidence may assist the jury in understanding and evaluating witnesses' testimony and thus is not necessarily cumulative. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1171 [13 Cal.Rptr.3d 34, 89 P.3d 353].)

presented it to one of Officer Ganz's sisters, who in turn gave it to their mother. Three members of an honor guard then were seen performing a three-volley rifle salute. Don was crying as he was presented with Officer Ganz's cap, and he was seen being comforted by his family. The videotape concluded with several officers passing by the casket; one left flowers on top of it. Other than the rifle salute and two clips of the bagpipes playing, the only audio on the videotape consisted of brief periods of church bells tolling and a woman singing. The prosecutor indicated a television station had shot the footage, but it was not professionally edited.

Defendant cites other jurisdictions' prohibition of gravesite evidence. (*State v. Storey* (Mo. 2001) 40 S.W.3d 898, 909 [admission of a photograph of the victim's tombstone was harmless error]; *Welch v. State* (2000) 2000 OKCR 8 [2 P.3d 356, 373] [admission of testimony about placing flowers on the victim's grave was harmless error].) In contrast, we have not prohibited such evidence. (*People v. Harris, supra,* 37 Cal.4th at pp. 351–352 [photographs of the victim's gravesite were relevant to the effect the murder had on her family; testimony about the effect of the accidental opening of the victim's closed casket during the funeral service was harmless error]; see *People v. Zamudio* (2008) 43 Cal.4th 327, 367–368 [75 Cal.Rptr.3d 289, 181 P.3d 105] [rejecting a challenge to the grave marker photographs included in a videotaped montage]; *People v. Kelly* (2007) 42 Cal.4th 763, 797 [68 Cal.Rptr.3d 531, 171 P.3d 548] [videotape ended with a brief view of the victim's grave marker]; *People v. Jurado, supra,* 38 Cal.4th at pp. 133–134 [finding no error in the admission of testimony concerning relatives' visits to the victim's gravesite].)

Defendant also cites *Salazar v. State, supra,* 90 S.W.3d 330, and *U.S. v. Sampson* (D.Mass. 2004) 335 F.Supp.2d 166 in challenging the use of videotape evidence. We have acknowledged the constitutional issues implicated by these cases. (*People v. Kelly, supra,* 42 Cal.4th at pp. 796–799; *People v. Prince, supra,* 40 Cal.4th at pp. 1286–1291; *People v. Robinson, supra,* 37 Cal.4th at p. 652.) But in contrast to the videotapes in *Salazar* and *Sampson,* the videotape here was shorter in length, did not include images of Officer Ganz as a child, was not a eulogy (as all actual eulogies from the ceremony were edited out), was not enhanced by narration or visual imagery, and was not accompanied by an extensive audio track playing sentimental music. Although the videotape was prepared for the penalty phase, it depicted actual events and was not of professional quality.

To be sure, the videotape did emphasize Officer Ganz's death (cf. *People v. Kelly, supra,* 42 Cal.4th at pp. 796–797), and some of the images on the videotape were evocative: The flag ceremony, the rifle salute, and the bagpipes were not particularly relevant to the effect of Officer Ganz's murder

on his family and friends, and tended to produce an emotional response from the viewer. Emotional evidence of how a community mourns the loss of a beloved citizen, however, does not necessarily violate the federal or the state Constitution. (See *People v. Dykes, supra,* 46 Cal.4th at p. 780 [victim's school conducted a memorial service]; *People v. Huggins, supra,* 38 Cal.4th at pp. 237–239 [statue of the victim erected by the community].) Moreover, victim impact evidence need not be limited to testimony that merely *implies* loss, grief, and anguish; it may also demonstrate it. (*People v. Mills* (2010) 48 Cal.4th 158, 211–212 [106 Cal.Rptr.3d 153, 226 P.3d 276] [upholding the admission of a videotape capturing the victim's boyfriend's reaction to news of her death]; see *People v. Davis* (2009) 46 Cal.4th 539, 618–619 [94 Cal.Rptr.3d 322, 208 P.3d 78] [upholding the admission of a photograph of the victim's "visibly upset" mother taken on the night of the crime].) In sum, the trial court did not abuse its discretion in admitting this videotape.

### b. *Evidence unrelated to the capital offense*

As noted, during the penalty phase, the prosecutor presented dozens of witnesses, many of whom were victims of defendant's prior criminal activity. During the course of their testimony, many of them described the lasting effect of their experiences. Defendant contends the trial court erred by failing to exclude this evidence as irrelevant and unduly prejudicial.

Prior to defendant's trial, the trial court granted defendant's motion in limine to exclude victim impact evidence concerning Catalina Correa's murder. After the prosecutor's penalty phase opening statement, defendant raised a number of concerns regarding the evidence the prosecutor intended to introduce.

The parties disagree as to whether defendant adequately objected to the introduction of evidence concerning the impact on victims other than Correa and Officer Ganz;[15] if defendant failed to object, this claim is forfeited on appeal. (Evid. Code, § 353, subd. (a); see, e.g., *People v. Kelly, supra,* 42 Cal.4th at p. 793.) Regardless of whether defendant's motion in limine or post-opening-statement objections encompassed the introduction of victim impact evidence related to his other crimes, and thus preserved the issue for appeal, such evidence was properly admitted.[16] The circumstances of uncharged violent criminal conduct, including its impact on the victims of that

---

[15] For example, defendant did object on relevance grounds to one of the bank tellers testifying about the effect his robbing her bank had had on her, but he did not object to similar testimony from other witnesses.

[16] The parties similarly disagree as to whether the prosecutor violated the trial court's order not to introduce this victim impact evidence, but defendant never raised an objection at trial on this basis. Regardless, such evidence was admissible.

conduct, are admissible under section 190.3, factor (b). (*People v. Bramit*, *supra*, 46 Cal.4th at p. 1241.)

Citing *Payne v. Tennessee*, *supra*, 501 U.S. at page 830, footnote 2, defendant contends these victims did not simply testify about the impact of his crimes but improperly gave characterizations and opinions about him and his crimes. Not so. For example, although various victims described defendant as having "cold dead eyes, almost like a shark's," or as being "cold, empty" (that witness also testified, "when I looked into his eyes I saw death"), or as having an "evil look," these are not after-the-fact opinions about defendant or his crimes, but rather percipient witnesses' descriptions (albeit colorful) of his demeanor during the commission of the crimes. As fear may be an element of the crime of robbery (§ 211), testimony about how defendant caused the victims to fear him was relevant and not improper victim impact evidence.

Defendant contends this victim impact evidence should have been excluded under Evidence Code section 352 as misleading, cumulative, or unduly inflammatory. Defendant has not demonstrated how any of the victim impact evidence was misleading. Moreover, the testimony regarding the residual fear or anxiety suffered by the robbery victims was brief and not unduly inflammatory or prejudicial.[17] To the extent defendant contends the prosecution's witnesses were cumulative to each other, he generally has forfeited this claim by failing to raise it in the trial court.[18] Moreover, although numerous witnesses testified, defendant committed numerous robberies, and the jury was entitled to hear about his extensive criminal history and the impact it had on his victims.

Citing *People v. Box* (2000) 23 Cal.4th 1153, 1201 [99 Cal.Rptr.2d 69, 5 P.3d 130], defendant contends the victim impact evidence unfairly persuaded the jurors to find that he had committed these crimes. The trial court properly instructed the jury with CALJIC No. 8.87, which provided, "Before a juror may consider any criminal activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit the activity." We presume the jury understood and followed this instruction. (See, e.g., *People v. Butler*, *supra*, 46 Cal.4th at

---

[17] Similarly, the trial court did not abuse its discretion in overruling defendant's objections to the prosecutor's use of two large-scale maps (of the Los Angeles area and the Washington-Oregon border) that were annotated with the locations, dates, and victims of defendant's crimes.

[18] With respect to one of the grocery store robberies, defendant did object to one witness's testimony as cumulative, as this witness was the third person to testify about that particular robbery. The trial court overruled the objection, finding this witness had observed acts that the other witnesses had not, thus making the testimony not cumulative. We see no abuse of discretion in the ruling.

p. 873.) In any event, the uncontested evidence at trial demonstrated defendant committed these prior crimes. For example, defendant contends the evidence implicating him in the pharmacy robbery was particularly weak, yet he was identified as the assailant and law enforcement personnel found, at his parents' residence, a ski mask and ammunition that matched those used in the pharmacy robbery.

### c. Cumulative effect

We have found no prejudicial error in the victim impact evidence the trial court admitted in this case. Nonetheless, defendant contends the sheer quantity and variety of victim impact evidence admitted had a cumulative effect on the verdict. Trial courts, of course, must exercise their discretion to exclude under Evidence Code section 352 evidence that is unduly cumulative. The record shows the trial court did exercise its discretion in determining what victim impact evidence was to be admitted with respect both to its emotional impact and its repetitiveness. Moreover, this is not a case where the victim impact evidence was significantly disproportionate to the mitigating evidence. The defense presented extensive mitigating evidence of defendant's family background; his harsh childhood, including his father's physical abuse of his mother and of defendant; and his possible mental impairments. There was no cumulative error with respect to the evidence that was admitted.

### 2. Prosecutor's Closing Argument

Defendant contends the prosecutor committed misconduct during her closing argument by appealing to passion and prejudice, commenting on his silence, arguing facts not in evidence, arguing based on speculation, appealing to vengeance, and appealing to religious beliefs.

Defendant failed to object at trial to many of the claimed instances of misconduct that he raises here, and accordingly he has forfeited any appellate contentions regarding those claims. (See, e.g., *People v. Friend* (2009) 47 Cal.4th 1, 29 [97 Cal.Rptr.3d 1, 211 P.3d 520]; *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) In any event, defendant's contentions lack merit.

A prosecutor's conduct violates the federal Constitution when it infects the trial with unfairness, and violates state law if it involves the use of deceptive or reprehensible methods of persuasion. (See, e.g., *People v. Friend*, *supra*, 47 Cal.4th at p. 29, citing *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a

reasonable likelihood the jury construed or applied the remarks in an objectionable fashion. (See, e.g., *Friend*, at p. 29.) Under that standard, we reject each of defendant's claims.

### a. *Appealing to passion and prejudice*

■ Defendant contends the prosecutor sought to arouse the jurors' fear of crime by comparing crime to a deadly virus, and also sought to appeal to their gratitude to law enforcement for being the "protectors" of society. The prosecutor, while gesturing toward police officers in the courtroom, quoted at some length from a speech given at the dedication of a monument honoring officers killed in the line of duty that praised the "valiant" men and women who protect the citizenry from the "marauders and the enemies." A prosecutor's argument, however, may draw upon common experience and knowledge, and reminding the jurors that society depends on law enforcement to ensure security and peace in the community is proper commentary about the role of law enforcement. (See, e.g., *People v. Ervine, supra*, 47 Cal.4th at p. 808; *People v. Brown, supra*, 33 Cal.4th at pp. 399–400; *People v. Mayfield, supra*, 14 Cal.4th at pp. 803–804.) Moreover, contrary to defendant's assertion, the prosecutor did not attempt to appeal to the jurors' sense of loyalty or patriotism, but rather rightly noted that the murder of a peace officer engaged in performing official duties is a particularly aggravated form of murder.

Defendant also contends the prosecutor conflated the victim impact evidence with an appeal to jurors' solidarity with law enforcement, by discussing Officer Ganz's service as a police officer. Evidence of Officer Ganz's service was properly before the jury, and the prosecutor's remarks were reasonable comment on that evidence.

Defendant further contends the prosecutor's argument left jurors with the impression they were "duty bound" by their oaths to vote for a death sentence.[19] The prosecutor argued to the jury: "This is a case where society cries out for the death penalty. As jurors, you are . . . the conscience of society." But the prosecutor's argument was nothing more than reasonable commentary on the evidence presented and a call to vote for death based on that evidence; she did not mislead the jury about its role. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1222 [24 Cal.Rptr.3d 112, 105 P.3d 487] [rejecting a challenge where the prosecutor "urged the jury to impose the death penalty because it would be 'good for society' and 'teach' society a moral lesson"]; *People v. Marlow* (2004) 34 Cal.4th 131, 152 [17 Cal.Rptr.3d

---

[19] To underscore this theme, throughout the prosecutor's argument she displayed a sign with a quotation attributed to Edmund Burke: "ABOUT THE ONLY THING NECESSARY FOR EVIL TO TRIUMPH IS FOR GOOD MEN TO DO NOTHING." (Bartlett, Familiar Quotations (15th ed. 1980) p. 374.)

825, 96 P.3d 126] [prosecutor's argument that the defendant's conduct had "'crossed the line' 'where we as a society say enough'" was proper argument based on reasonable inferences from the method of killing]; *People v. Hardy* (1992) 2 Cal.4th 86, 211 [5 Cal.Rptr.2d 796, 825 P.2d 781] [prosecutor's argument that the jury "was 'obligated as members of this society . . .' to return a death verdict if it found the aggravating evidence outweighed the mitigating evidence," in conjunction with the jury instructions, did not mislead the jury about the scope of its sentencing discretion].) Moreover, to refer to the jury as the conscience of society is not improper. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 741 [47 Cal.Rptr.3d 326, 140 P.3d 657].)

 Finally, defendant contends the prosecutor's use of the "Bengal tiger" metaphor (see *People v. Duncan* (1991) 53 Cal.3d 955, 976 [281 Cal.Rptr. 273, 810 P.2d 131]) was a thinly veiled racist allusion to his Vietnamese heritage. As we noted in *Duncan*, likening a murderer to a wild animal does not necessarily invoke racial overtones. (*Id.* at p. 977; cf. Howarth, *Representing Black Male Innocence* (1997) 1 J. Gender Race & Just. 97, 136–138.) On the record before us, it appears the prosecutor's argument was intended merely to note that defendant's docile behavior in the courtroom was not irreconcilable with his violent conduct in less controlled circumstances. (See, e.g., *People v. Valencia* (2008) 43 Cal.4th 268, 307 [74 Cal.Rptr.3d 605, 180 P.3d 351].)

### b. *Commenting on his silence*

Defendant contends the prosecutor commented on his silence, in violation of *Griffin v. California, supra*, 380 U.S. 609, when she argued, "[W]e have heard no evidence at all of any remorse from [defendant] . . . ." The prosecutor, however, noted the lack of evidence and did not refer to defendant's silence; a prosecutor is entitled during closing argument to highlight a defendant's lack of remorse, and doing so does not necessarily violate *Griffin*. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 393–394 [116 Cal.Rptr.2d 401, 39 P.3d 432].) If defendant had appeared sorry in front of another person, performed an act of contrition, apologized to any of his victims, or otherwise demonstrated any remorse, a witness other than he could have testified about such acts or statements, but none did.

### c. *Arguing facts not in evidence*

In an attempt to undermine defendant's claim that his father Phillip was an uncaring parent, the prosecutor noted Phillip took out a second mortgage on the family home in order to travel to see defendant while he was in federal custody. Defendant's contrary contention notwithstanding, his mother Diep

testified Phillip did just that. As such, the prosecutor's argument was an accurate comment on the evidence presented.

### d. *Arguing based on speculation*

■ Defendant contends the prosecutor improperly speculated that defendant would pose an ongoing threat to prison personnel if he were not sentenced to death. As defendant concedes, a prosecutor properly may argue the potential risk of a capital defendant's future violence when the argument is based on evidence of past crimes. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1179 [63 Cal.Rptr.3d 297, 163 P.3d 4].) The prosecutor's argument concerning defendant's dangerousness in prison was proper rebuttal of an expert witness's testimony about defendant's ability to function in a highly structured environment. (See *People v. Davis* (1995) 10 Cal.4th 463, 540 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Given defendant's murder of Catalina Correa, the numerous armed robberies, and his expert's concession that his MMPI results were similar to those of persons who have problems adjusting to prison life, the prosecutor's argument was a reasonable commentary on the evidence.

### e. *Appealing to vengeance*

Defendant contends the prosecutor argued to the jury that it ought to avenge the murders of Officer Ganz and Catalina Correa by returning a death verdict. The prosecutor argued, "I suggest that you show [defendant] the same sympathy that he showed to Martin Ganz and the same sympathy that he showed to Catalina Correa" and "there is no sympathy for any human so great to outweigh the aggravating factors in this case." As defendant concedes, we repeatedly have ruled it is not misconduct for a prosecutor to ask the jury to show a defendant the same lack of sympathy the defendant showed the victims (see, e.g., *People v. Kennedy* (2005) 36 Cal.4th 595, 636 [31 Cal.Rptr.3d 160, 115 P.3d 472]), and we do so again here.

Even if the prosecutor's arguments were not a proper rebuttal to defendant's plea for sympathy, but rather a call for vengeance, isolated references to retribution or community vengeance do not constitute misconduct. (See *People v. Davenport* (1995) 11 Cal.4th 1171, 1222 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

### f. *Appealing to religious beliefs*

Defendant contends the prosecutor directly invoked religion during her closing argument. While discussing Catalina Correa's murder, the prosecutor said: "And what I thought was particularly telling, she died wearing her

cross. And there was not one thing she did to deserve her life ending in that manner." The prosecutor concluded her argument by saying, "I ask you to let this Christmas and two days after on the 27th, which will be the fifth year anniversary of the murder of Martin Ganz, let this be the Christmas and this be the anniversary of his death, that those who knew him and loved him can finally have a sense that some justice has occurred."[20]

■ Arguments that refer to religion in an effort to convince the jury to impose the death penalty are improper. (E.g., *People v. Zambrano, supra,* 41 Cal.4th at pp. 1169–1170.) The prosecutor's arguments, however, did not appeal to a religious authority in urging the jury to return a death verdict. Even were we to assume the prosecutor's remarks constituted improper references to religion, they did not diminish the jury's sense of responsibility to follow the trial court's instructions, and there is no reasonable likelihood the jury applied the remarks in an objectionable fashion. (See *People v. Friend, supra,* 47 Cal.4th at p. 29; see, e.g., *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1059–1061 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

### 3. *Jury Instruction on a Juror's Refusal to Deliberate*

Defendant contends the trial court erred in instructing the jury, over his objection, with CALJIC No. 17.41.1 concerning the obligation of the other jurors if a juror refuses to deliberate.[21]

Since defendant's trial, we have disapproved this instruction but, as defendant concedes, we previously have rejected similar claims that the instruction violates a defendant's federal constitutional rights, and we do so again here. (See, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 805–806 [80 Cal.Rptr.3d 211, 187 P.3d 1041].)

### 4. *Denial of Defendant's Automatic Application for Modification of the Death Verdict*

Defendant contends the trial court erred under state law when, in denying his automatic application for modification of the death verdict, it failed to determine independently whether the death penalty was appropriate in light of the relevant evidence and applicable law.

---

[20] The prosecutor gave her closing argument approximately 10 days before Christmas in 1998.

[21] CALJIC former No. 17.41.1, as modified and read by the trial court, provided: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror is refusing to deliberate or expresses an intention to disregard the law or to decide the case based on any improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."

In ruling on defendant's application for modification of the verdict, the trial court must reweigh the evidence; consider the aggravating and mitigating circumstances; and determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict. (See, e.g., *People v. Carrington, supra,* 47 Cal.4th at p. 201.) On appeal, although the trial court's ruling is subject to independent review, we do not make a de novo determination of penalty. (See, e.g., *People v. Wallace* (2008) 44 Cal.4th 1032, 1096 [81 Cal.Rptr.3d 651, 189 P.3d 911].)

Defendant failed to assert most of the claims he raises here when the trial court ruled on the automatic application, and accordingly he has forfeited any appellate contentions regarding those claims. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969] [contemporaneous objection rule applies to cases in which the modification hearing was conducted after this court's decision in *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984] became final].) In any event, defendant's claims lack merit as the weight of the evidence supported the jury's verdict.

Defendant contends the trial court failed to meaningfully evaluate the evidence of his mental disorder under section 190.3, factor (k) or to give it the proper weight under other sentencing factors. In denying defendant's automatic application, the trial court explicitly rejected his argument based on his mental condition, finding his expert's opinion that he suffered from a brain disorder was "feeble." The trial court also rejected defendant's claim that he suffered from any extreme mental or emotional disturbance during the commission of the crimes. The trial court acknowledged the evidence of defendant's traumatic childhood and cited factor (k), but found that evidence was outweighed greatly by the evidence in aggravation.

Defendant also contends there was insufficient evidence to support his first degree murder conviction and the special circumstance of commission of a murder to avoid lawful arrest, and the trial court failed to consider this when ruling upon his automatic application. This claim fails, as the trial court explicitly found defendant was guilty beyond a reasonable doubt and that he killed Officer Ganz with the requisite premeditation and for the purpose of avoiding a lawful arrest.

Defendant contends the trial court erred by relying on the testimony of the victims of his prior crimes regarding how his crimes had affected their lives. Such evidence is relevant and admissible. (See, e.g., *People v. Davis, supra,* 46 Cal.4th at pp. 617–619.)

Defendant also contends the trial court erred by conducting a "piecemeal" evaluation of the mitigating evidence, which had the effect of reducing the

weight of the entirety of the mitigating evidence. The trial court, however, explicitly stated it had reviewed "all of the evidence available," and had "carefully and separately" weighed the aggravating and mitigating factors. There is no evidence the trial court considered the mitigating factors in piecemeal fashion. (See *People v. Lucero* (2000) 23 Cal.4th 692, 738 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

Finally, as the trial court did not commit any errors when denying defendant's automatic motion, there are no errors to cumulate on review.

### 5. *Arbitrary Imposition of the Death Penalty*

Defendant contends the death penalty in California is imposed arbitrarily and capriciously depending on the county in which the case is prosecuted.

Prosecutorial discretion to select in which eligible cases the death penalty will actually be sought is not evidence of an arbitrary and capricious death penalty system. (See, e.g., *People v. Bennett* (2009) 45 Cal.4th 577, 629 [88 Cal.Rptr.3d 131, 199 P.3d 535].) Contrary to defendant's contention, the voting rights case *Bush v. Gore* (2000) 531 U.S. 98 [148 L.Ed.2d 388, 121 S.Ct. 525] does not compel a different result. (See, e.g., *Bennett*, at p. 629, fn. 19.)

### 6. *Delay in the Appointment of Appellate Counsel*

Defendant contends the nearly 33-month delay between the entry of judgment and the appointment of appellate counsel violated his federal constitutional rights to equal protection and due process.

As defendant concedes, we previously have ruled the delay in appointing counsel and processing the appeal is necessary to protect condemned prisoners' rights, and we do so again here. (See, e.g., *People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1068.)

### 7. *Execution Following Lengthy Confinement*

Defendant contends the delay in executing him has resulted in an extended, degrading, and solitary incarceration on death row that has caused extraordinary psychological distress and thus constitutes cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15–17.)

We previously have rejected similar claims, and we do so again here. (See, e.g., *People v. Davis*, *supra*, 46 Cal.4th at p. 628.)

8. *Constitutional Challenges to California's Death Penalty Statute*

Defendant contends his death sentence violated various guarantees under the federal Constitution. (U.S. Const., 5th, 6th, 8th & 14th Amends.) As we have in other cases, we reject defendant's contentions. Specifically: California's death penalty statute is not impermissibly broad and adequately narrows the class of death-eligible defendants. (See, e.g., *People v. Davis*, *supra*, 46 Cal.4th at p. 627.)

Section 190.3, factor (a), whether considered on its face or as applied, does not allow for arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; see, e.g., *People v. Martinez* (2009) 47 Cal.4th 399, 454 [97 Cal.Rptr.3d 732, 213 P.3d 77].)

A death sentence need not be premised on findings (either beyond a reasonable doubt or by a preponderance of the evidence) by a unanimous jury that one or more aggravating factors exist, that these factors outweigh the mitigating factors, and that death is the appropriate penalty. (See, e.g., *People v. Burney*, *supra*, 47 Cal.4th at pp. 267–268.) No "tie-breaking rule" is necessary, and the jury need not be instructed that there is no burden of proof. (See, e.g., *People v. Bennett*, *supra*, 45 Cal.4th at p. 632.) Contrary to defendant's contention, neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] compels a different result. (See, e.g., *People v. Martinez*, *supra*, 47 Cal.4th at p. 455.)

The federal Constitution does not require written jury findings during the penalty phase. (See, e.g., *People v. Burney*, *supra*, 47 Cal.4th at pp. 267–268.)

Intercase proportionality review is not constitutionally required. (See, e.g., *People v. Martinez*, *supra*, 47 Cal.4th at p. 455.)

The jury need not be instructed as to which sentencing factors are aggravating and which are mitigating. (See, e.g., *People v. Samayoa* (1997) 15 Cal.4th 795, 862 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

Equal protection does not require that capital defendants be afforded the same sentence review afforded other felons sentenced under the determinate sentencing law. (See, e.g., *People v. Martinez*, *supra*, 47 Cal.4th at p. 456.)

Despite the abolition of the death penalty in the majority of nations (including all of Western Europe), California's assertedly regular imposition

of the death penalty as punishment for a substantial number of homicides does not violate international law or norms. (See, e.g., *People v. Carrington*, *supra*, 47 Cal.4th at pp. 198–199.)

## CONCLUSION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for rehearing was denied October 13, 2010.