**[J-52-2013][M.O. – Eakin, J.]**

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 657 CAP |
| | : | |
| Appellee | : | |
| | : | Appeal from the Order entered on |
| v. | : | 4/4/12 in the Court of Common Pleas, |
| | : | Criminal Division of Montgomery County |
| | : | at No. CP-46-CR-0002785-2005 |
| JOHN EICHINGER, | : | |
| | : | |
| Appellant | : | ARGUED:  June 19, 2013 |

## CONCURRING OPINION

**MR. JUSTICE SAYLOR**                    **DECIDED:  December 31, 2014**

I concur in the result and offer the following comments organized according to the numerical conventions employed in the majority opinion.

## Issues II & III

The majority deems lead trial counsel's approach in making very early selections of trial strategy,[1] leading to an unusual "stipulated bench trial" for the guilt phase, to be "entirely reasonable."  Majority Opinion, slip op. at 35.  I have substantial reservations in this regard.

First off, the case involves a capital defense attorney who was unfamiliar with the American Bar Association Guidelines for the Appointment and Performance of Defense

---

[1] See, e.g., N.T., June 15, 2011, at 51-52 (reflecting trial counsel's accession that the strategy of conceding guilt and advancing contrition was "the strategy [he] formed from day one"); id. at 44 (reflecting counsel's comment that, as early as the preliminary hearing, his approach to the defense was "just fall on the sword, mea culpa, hope for the best, that they spare [Appellant's] life").

Counsel in Death Penalty Cases (the "ABA Guidelines"). See N.T., Feb. 8, 2011, at 29. This core resource, in its various permutations, has been in existence since 1989 and has been referenced by the Supreme Court of the United States as containing "guides to determining what is reasonable." See, e.g., Wiggins v. Smith, 539 U.S. 510, 524, 123 S. Ct. 2527, 2536-37 (2003) (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065 (1984)).[2] Had counsel referenced those guidelines, he would have appreciated the following cautionary advice as encapsulated by the Supreme Court of the United States:

> [P]leading guilty without a guarantee that the prosecution will recommend a life sentence holds little if any benefit to the defendant. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases §10.9.2, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1045 (2003) ("If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights."). Pleading guilty not only relinquishes trial rights, it increases the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence. See [Gary] Goodpaster, [The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,] 58 N.Y.U.L. Rev. [299,] 331 [(1983)]. . . .

---

[2] In reference to such guidelines, this Court's opinions tend to stress that the guidelines are not mandatory. See, e.g., Commonwealth v. Sepulveda, 618 Pa. 262, 294 n.15, 55 A.3d 1108, 1127 n.15 (2012). Nevertheless, they certainly present a comprehensive resource made readily available to capital defense counsel by a prominent national bar association upon careful study and reflection. As of the time of Appellant's trial, 2005, it seems inconceivable to me that a lawyer would undertake representation in a death-penalty case having no familiarity with these well-recognized guidelines.

<u>Florida v. Nixon</u>, 543 U.S. 175, 191 n.6, 125 S. Ct. 551, 562 n.6 (2004).[3]  It also seems to me to be highly questionable for the attorney to select a strategy centered on remorse, at a time when the client will not affirmatively acknowledge factual guilt relative to the crimes.  <u>See</u> N.T., July 21, 2011, at 5, 13.

I have similar thoughts relative to Issue VI, which concerns counsel's stewardship at the penalty stage, in that I simply am far more circumspect about the representation afforded to Appellant at his capital trial than the majority.  Thus, ultimately, my concurrence in the result rests more on the prejudice assessment than on the majority's various approvals of the attorneys' performance.

**Issue IV**

To the degree the majority holds that federal constitutional law does not require a colloquy related to waivers of core constitutional trial rights at a capital proceeding which are dispositive of guilt, <u>see</u> Majority Opinion, <u>slip</u> <u>op.</u> at 9, I find the decision to be in material tension with <u>Boykin v. Alabama</u>, 395 U.S. 238, 243-44, 89 S. Ct. 1709, 1712 (1969) ("What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequence.").[4]  Although <u>Boykin</u> arose in the setting of a guilty plea, I fail to see that the "stipulated bench trial" which occurred here represented anything short of such a plea (functionally and in terms of the consequence-laden accessions involved).

---

[3] While Appellant did not actually plead guilty, the procedure employed was tantamount to a plea in all respects material to the Supreme Court's analysis, above.

[4] The majority's treatment appears to be limited to Appellant's claim as it relates to the waiver of his right to a jury trial.  <u>See</u> Majority Opinion, <u>slip</u> <u>op.</u> at 9.  Appellant's brief, however, also speaks to the broader sphere of constitutional rights which he waived, including his right to "contest the evidence against him."  Brief for Appellant at 28.

Accordingly, while I agree with the majority's alternative assessment that the actual colloquy was sufficient, see Majority Opinion, slip op. at 9-12, I distance myself from the suggestion that such colloquy had no independent significance under the United States Constitution.

**Issue V**

The majority opinion appears to suggest that the rejection, on direct appeal, of a record-based claim touching on the voluntariness of a confession obviates a challenge, on a developed post-conviction record, to trial counsel's failure to adduce mental-health evidence to establish a lack of voluntariness. See Majority Opinion, slip op. at 14. I find such reasoning to be out of sync with the governing review standards. See, e.g., Commonwealth v. Collins, 585 Pa. 45, 60-61, 888 A.2d 564, 573 (2005) (holding that an assertion of ineffective assistance of trial counsel raises a cognizable post-conviction issue, even if the underlying claim has been previously litigated). Indeed, I fail to see how a court, on direct appellate review, can "impliedly" adjudge a defendant's mental-health condition, Majority Opinion, slip op. at 14, without any factual record whatsoever relative to mental-health impairments first asserted on collateral review. On this claim, I support the result based on the alternative rationale centered on the post-conviction court's findings. See id.

**Issue VI**

Consistent with my assessment of trial counsel's performance in the guilt phase of trial, I regard the analysis of Appellant's claims that his trial attorney failed to adequately develop and present mitigating evidence at the penalty stage as being of a much more greatly mixed nature than does the majority. On the one hand, counsel did collect various social history records and ultimately did consider consultation with and engagement of mental-health professionals, as contrasted with the abysmal

performance of numerous appointed Pennsylvania capital defense attorneys in the many cases we have seen in which these sorts of rudimentary preparatory measures were omitted. See, e.g., Commonwealth v. King, 618 Pa. 405, 448-57, 57 A.3d 607, 633-38 (2012) (Saylor, J., concurring specially). On the other hand, the lawyer was unfamiliar with the use of a mitigation specialist and the preparation of a social history, see N.T., Feb. 8, 2011, at 46-47; N.T., July 6, 2011, at 67, conventions addressed in the ABA Guidelines with which counsel also was unacquainted, see N.T., Feb. 8, 2011, at 29.

It also seems to me that counsel may have relegated an inordinate amount of responsibility to the mental-health professionals in terms of assessing mitigation. See, e.g., N.T., Nov. 29, 2011, at 24-25 (reflecting counsel's indication that he simply delivered life-history records to the defense psychiatrist and left it up to the psychiatrist to determine what documents were relevant); id. at 134 (reflecting counsel's attestation to an approach that he was "just going to defer to whatever [the psychiatrist] suggested"); N.T., July 6, 2011, at 100 ("I just left it all in his hands."). This, of course, led the defense experts, on collateral review, to distinguish their relationship with trial counsel from other instances in which capital defense attorneys and the defense experts worked as a team, per the approach recommended in the ABA Guidelines. See, e.g., N.T., Oct. 25, 2011, at 128-29 (reflecting testimony to such effect from the defense psychiatrist). Of additional concern is the "extremely compressed time frame" in which the psychiatrist was expected to operate, id. at 128, as trial counsel only first met with him a little over a month before the penalty proceeding, such that a report was not generated until just a few days before the penalty hearing. See N.T., Nov. 29, 2011, at 133; N.T., July 6, 2011, at 105.

Finally, counsel's pivotal dependence on Appellant's ability to testify credibly to remorse in the penalty hearing, see, e.g., N.T., July 6, 2011, at 86, seems to me to have been misguided. Anyone reading this record, including the prosecutor's extensive references to Appellant's journal detailing the killings, see, e.g., N.T., Nov. 3, 2005, at 19-20, will have a ready appreciation of the devastating cross-examination available to the Commonwealth, had Appellant been presented as a witness on his own behalf. Indeed, in light of such obvious avenues for cross-examination, trial counsel acknowledged that there was slim hope that Appellant would have been regarded by the jury as being sincere, had he testified to remorsefulness. See N.T., Oct. 24, 2011, at 69. Along these lines, counsel acknowledged, fatalistically, in the post-conviction proceedings that he thought "[h]earing it from [Appellant] was the best we were going to do." Id.

Again, I believe Pennsylvania capital defense attorneys should utilize all available resources to gain a better appreciation of alternatives before selecting a strategy with such large and obvious drawbacks. I also think that, in the hopes of setting a course for better performance in future cases, we should be careful about lending our approval to instances of stewardship manifesting a less informed and deliberative character. Thus, again, my concurrence in the result rests entirely on the prejudice component.

**Issues VII & IX**

To the extent that the majority holds that a prosecutor should be permitted to discuss a defendant's future dangerousness only in rebuttal, where a defendant places his future conduct into issue in development of the mitigation case, see Majority Opinion, slip op. at 16, I agree. I also concur in the majority's judgment that Appellant would appear to have opened the door for the prosecution to explore the potential for

consistency in Appellant's conformance.  Cf. People v. Brady, 236 P.3d 312, 342 (Cal. 2010) ("The prosecutor's argument concerning defendant's dangerousness in prison was proper rebuttal of an expert witness's testimony about defendant's ability to function in a highly structured environment.").

While I believe that the prosecutor's actual arguments entreating the jury to return a death verdict to prevent future killings tested the appropriate limits for rebutting mitigation, this Court has set a very high bar for reversal on grounds of prosecutorial misconduct where the trial court has issued appropriate instructions; the aggravating circumstances in the present case were indeed compelling; and even on post-conviction review Appellant has failed to present a convincing case that the range of available mitigating evidence was such that the defense would have been able to do much better with more knowledgeable attorneys at the helm.  Thus, while I maintain my position that the range of this Court's tolerance for "oratorical flair" in death-penalty cases should be narrower, and that prosecutors should confine their arguments more closely to the evidence and the law, see, e.g., Commonwealth v. Spotz, 616 Pa. 164, 276, 47 A.3d 63, 131 (2012) (Saylor, J., concurring), ultimately, I concur in the result affirming Appellant's judgment of sentence.