Filed 7/15/15  P. v. Pouncy CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROLAND POUNCY,<br><br>    Defendant and Appellant. | A142075<br><br>(City & County of San Francisco<br>Super. Ct. No. 219120) |

Defendant Roland Pouncy appeals his conviction for first degree murder. His primary contentions are that the trial court erred in excluding evidence allegedly tending to show that another person committed the killing, and that the court's standard instructions erroneously permitted conviction on a legally insufficient theory of premeditated and deliberate implied malice murder. We find no merit in his contentions and shall affirm the judgment.

**Background**

Defendant was charged with the murder of Richard Sprague (Pen. Code, § 187, subd. (a)), [1] with the special circumstance of robbery felony murder (§ 109.2, subd. (a)(17)), and with robbery (§ 211), committed within five years of a prior prison term (§ 667.5, subd. (b)) and while on parole(§ 1203.085, subd. (b)). A jury convicted defendant of first degree murder, but deadlocked, resulting in a mistrial and dismissal of the robbery and special circumstance charges. The court found the prior prison term

---

[1] All statutory references are to the Penal Code unless otherwise noted.

allegation true, and sentenced defendant to 25 years to life in prison on the murder conviction plus one year for the prior prison term. Defendant has timely appealed.

There was evidence at trial of the following.

Around 2:40 a.m., the morning of February 19, 2012, Lilia Puch[2] was awakened by a disturbance outside her home on Julian Avenue (referred to as "Julian Alley") in San Francisco. She heard a man outside "screaming for help," "calling out for help for somebody to call 911" and yelling "My wallet." After the screaming continued for a period that Puch estimated to be 10 minutes, she went to the window and observed a man straddling the struggling victim, with his hands around the victim's neck, "strangling him," "squeezing. You could tell that he was squeezing his neck."[3] Puch did not see the assailant's face, but saw that he was wearing a gray sweatshirt with a "hoodie" and what she referred to as a black "cap" or "beanie," "like a ski cap." Puch returned to bed and when "everything went silent" she "thought, oh, somebody came to rescue him." In the morning, however, Sprague was found lying on the sidewalk, dead. The cause of death was "manual strangulation."

At approximately 1:30 p.m. that same day, police officers stopped defendant for jaywalking near 16th and Mission Streets. Defendant was wearing a hooded sweatshirt. When asked for identification, defendant removed a bank debit card from his wallet, put it aside, and then denied that it was his. The debit card belonged to Sprague, the strangulation victim.

Bank records revealed that Sprague's debit card was used numerous times that morning to make purchases and to withdraw cash. A video tape taken at a McDonald's restaurant on Mission Street showed defendant, wearing a beanie, using the card to make a purchase. He also gave the card to others to purchase food at McDonald's. Defendant met a friend on Mission Street, Shekinah Sullivan, who wanted to buy shoes and

---

[2] Ms. Puch stated her full name to be Lilia Marcella Puch Ortegon, but she was addressed as Ms. Puch throughout the proceedings.

[3] A second witness who lived down the block also heard a "muffled" cry for help, but saw nothing when he looked out his window.

defendant told her he had a credit card he would use to make a purchase and she would pay him half price for the shoes. The two went to a nearby shoe store, Sheikh Shoes, each selected a pair of shoes, but the manager on duty refused to accept the card for payment. Defendant left the store upset and told Sullivan "he had just killed a motherfucker for that card." Sullivan testified that defendant's words were: "I just killed the motherfucker in the alley last night." Sullivan saw that the name on the card was "Richard Sprague." The manager on duty at the shoe store confirmed that he refused to accept the card for payment after defendant told him he did not know the PIN for the card and had no identification. A video taken inside the store, showing defendant wearing a beanie, provided further confirmation of the attempted purchase.

A forensic pathologist confirmed the cause of Sprague's death as manual strangulation and testified that there were abrasions on the side of his neck consistent with fingernails. Swabs from the neck were taken that a criminologist tested and found to have the same DNA profile as defendant's DNA (with the probability of finding the same profile in an African-American one in 1.83 quadrillion).

Defendant testified in his own defense. He testified that the afternoon before he was arrested, he was in the Tenderloin district "[g]etting high with some homeless crack users," and he then went to 16th and Mission streets where he "ran into a few drug users, like I usually do, and they got me high." That night he "took a walk inside Julian Alley" where he saw "a body laying on the ground" that was not moving and had "scratches, bruises on the forehead and the chin." He "wanted to check the person" so he first tapped him on the shoulder and then checked his pulse by placing his hand "under the chin" in the neck area between the jawbone and the shoulder. He did this "[b]ecause normally if you do that to somebody, they might be alive and they might punch you, wake up and punch you. So I was basically checking for my safety." He "was going to check and go through his pockets." He checked one front pocket only "and found a credit card." He took the card and used it to purchase food for "a few homeless people" at McDonald's and made purchases at other stores on Mission Street. Defendant acknowledged the

3

unsuccessful attempt to purchase shoes with Sullivan but denied that he told her that he had killed anybody, and he denied that he killed Sprague.

**Discussion**

**1. *Third party culpability evidence.***

Defendant contends that the trial court erroneously excluded three items of evidence that tended to cast doubt on whether he was the person who strangled the victim. These items were: (1) a white knit "watch cap" found somewhere in the vicinity of Sprague's body that contained a DNA profile inconsistent with defendant's profile; (2) DNA evidence from scrapings under Sprague's fingernails that may not have been consistent with defendant's profile; and (3) surveillance camera footage showing several people behind Sprague on three occasions the morning of his death when he withdrew $40 from ATM machines, presumably to buy drugs from those persons. The trial court ruled that all of this evidence was inadmissible as third party exculpatory evidence because it failed to establish "a link . . . between this alleged evidence and the perpetration of the crime, evidence leading to somebody else, and all the cases talk about having this established link."

There is a long line of cases discussing the admissibility of so-called third-party culpability evidence. In *People v. McWhorter* (2009) 47 Cal.4th 318, 367, our Supreme Court explained: " 'We repeatedly have indicated that, to be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime.' " Our high court expanded: "In *People v. Hall* (1986) 41 Cal.3d 826, we held 'the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' (*Id.* at p. 833.) 'Our holding [in *Hall*] did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability. The evidence must meet minimum standards of relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's

4

guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833.) We also reaffirmed that such evidence is subject to exclusion under Evidence Code section 352.' " (47 Cal.4th at p. 368.)

In *People v. Brady* (2010) 50 Cal.4th 547, 558, the Supreme Court reiterated: "Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant. But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime." These principles were again repeated in *People v. Elliott* (2012) 53 Cal.4th 535, 580-581, where the court added, "A trial court's ruling excluding third party culpability evidence is reviewed for abuse of discretion." (*Id.* at p. 581.)

Focusing on each of the three items of excluded evidence, we cannot say that the trial court's rulings were an abuse of discretion. The cap containing no trace of DNA matching defendant's profile apparently was picked up by crime scene investigators, along with numerous other items such as a matchbook, a lottery ticket and a liquor bottle. These items were found an unspecified distance from Sprague's body somewhere in Julian Alley. The cap apparently was white, in contrast to Puch's testimony that the assailant was wearing a black beanie, and no additional evidence was proffered to suggest that the "watch cap" was, or even resembled, the cap that Puch observed on the assailant. Hence, the court was justified in concluding that the cap was not shown to have likely been worn by a third person linked to Sprague's strangulation, and it was therefore irrelevant that the cap did not contain defendant's DNA. As the court stated, the cap "doesn't lead to a[n] . . . identifiable third person who is linked to the perpetration of the crime. That would be pure speculation."

In considering the admissibility of DNA evidence of the swabs containing scrapings taken from beneath Sprague's fingernails, the court reviewed the laboratory

report concerning those swabs. The report concluded that defendant was not the major contributor to the mixture of DNA from at least two individuals that was detected in the swabs, but that no findings were possible as to the minor contributor. In concluding that the evidence was not admissible, the court cited the statement in the report, "Due to insufficient genetic information detected in the minor component, no conclusions were made concerning Roland Pouncy, Richard S., or any other potential contributor." [4] The court did not abuse its discretion in concluding that this report did not allow defendant "to argue that it's likely that somebody else did it." There was no relevance to a report stating that no conclusions could be drawn as to whether the second person whose DNA was included was or was not defendant.

The third item of rejected evidence was described by the prosecutor as follows. An ATM video from U.S. Bank shows that "Mr. Sprague went to the U.S. Bank at 16th and Mission on three separate occasions within about an hour period of time and each time drew $40, and there is video that shows Mr. Sprague in the company of other individuals apparently for the purposes of engaging in the purchase of a controlled substance of one kind or another." Defense counsel argued the evidence was relevant because it showed Sprague "engaged in conduct with at least disreputable people very soon before, and none of those people is Mr. Pouncy," and that "any one of those could have done Mr. Sprague in." The trial court excluded the video "because I think it just invites the jury to speculate that somebody out there in the crowd, perhaps dealing in whatever was found in his system, that one of those was the person that did Mr. Sprague in, and it's complete

_____

[4] The full report, which the court read into the record, reads as follows: " 'Genetic analysis results indicate that a mixture of DNA from at least two individuals was detected in the left fingernail swabs. Richard S.' meaning Sprague, the decedent, 'is included as a possible major contributor to the mixture of DNA detected in the left fingernail swabs. Roland Pouncy is excluded as the possible major contributor to the mixture of DNA detected in the left fingernail swabs. Due to insufficient genetic information detected in the minor component, no conclusions were made concerning Roland Pouncy, Richard S., or any other potential contributor. The major DNA profile is not eligible for submission to the CODIS [The FBI's Combined DNA Index System]. The minor DNA profile is not suitable for submissions to the CODIS.' "

6

speculation." The court concluded, consistent with the cases cited above and numerous other cases brought to its attention, that the proffered evidence was not linked in any way to the commission of the crime and thus was irrelevant and inadmissible.

We do not suggest that third person culpability evidence can be received only if the evidence identifies a specific named individual as the perpetrator of the crime with which the defendant is charged. In a proper case there undoubtedly could be evidence tending to show that another person committed the charged crime even if the identity of that person is unknown. In the present case, for example, the relevance of the cap without defendant's DNA would be apparent if there were some evidence that the cap was worn by the victim's assailant. What is missing in this case with respect to both the cap and the bank video is any evidence linking those items to Sprague's murder. As the court stated, any conceivable linkage depended on pure speculation, which is not a proper foundation for such evidence. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1136-1137.) "Although defendant's testimony may have raised a suggestion that Pablo [an individual involved with the victim in a drug transaction] or some other third party involved in drug trafficking had a motive or possible opportunity to murder [the victim], additional direct or circumstantial evidence was required to link Pablo or some other third party to the actual perpetration of the crime." (*Id.* at p. 1137.)

The fingernail swabs are linked to the crime, since it is a reasonable inference that in the struggle that preceded Sprague's death he likely scratched his assailant as he was scratched. However, the swabs were inadequate to permit the determination, one way or the other, whether defendant's DNA was present in the scrapings. There was thus no relevance to the evidence.

Defendant contends that the exclusion of this evidence violated the "Right to Truth-in-Evidence" provision added to the California Constitution by Proposition 8 in 1982 (Cal. Const., art. I, § 28, subd.(f)(2)), and violated his right to present a complete defense guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution. His argument is based on the premise that the excluded evidence was relevant to cast doubt on the identification of him as the person who strangled Sprague, and was excluded

only because of a judicially created exclusionary rule requiring a "direct connection" to the crime to establish admissibility. This premise, however, is unfounded. While the California Constitutional provision does provide that "relevant evidence shall not be excluded in any criminal proceeding,"[5] the basis of the court's ruling, as discussed above, was that the proffered evidence was not relevant. The absence of a link between the proffered evidence of the white cap and the video and the crime rendered the evidence irrelevant, as did the inability to reach any conclusions about the minor contributor of the DNA in the fingernail scrapings. This evidence was not excluded because of a rule excluding relevant evidence for extraneous policy considerations, but simply because it was not relevant. Thus, there was neither a violation of the "Right to Truth-in-Evidence" provision nor a denial of the constitutionally protected right to present a defense.

## 2. *Murder instructions*

Defendant makes a convoluted argument that the CALCRIM instructions given in this case were erroneous. The instructions, defendant contends, permitted the jury to find defendant guilty of first degree murder "based on the legally insufficient theory of premeditated implied malice murder," i.e., without finding that defendant intended to kill the victim.

Based on CALCRIM No. 520 the court instructed that defendant committed murder if he committed an act causing Sprague's death with "a state of mind called malice aforethought."[6] The instruction continues by stating that "[t]here are two kinds of malice aforethought, express malice and implied malice," either of which is sufficient to establish the state of mind required for murder. Further, the instruction explains that the defendant acted with express malice if he unlawfully intended to kill, and with implied

---

[5] The provision is qualified by the following sentence: "Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103." (Cal. Const., art 1, § 28, subd. (f)(2).)

[6] The court also instructed on the theory of felony murder. Since the jury was unable to agree on the robbery or special circumstance charges, we agree with defendant that the first degree murder verdict must have rested, at least in the mind of some jurors, on a finding of malice aforethought.

malice if: "1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; AND [¶] 4. He deliberately acted with conscious disregard for human life." The court modified the final sentence of the instruction to read: "*If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree.*" Then, drawing verbatim from CALCRIM No. 521, the court instructed: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against the choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime."

Defendant's argument, as we can best understand it, is that the sentence italicized above erroneously indicates that the jury must determine whether the murder was first or second degree even if it finds only implied malice. While first degree murder requires an intent to kill, implied malice requires only the intent to commit an act the natural and probable consequences of which are known by the defendant to be dangerous to human life and he deliberately acts with conscious disregard for human life. Defendant's point is valid, since the sentence, modified from the language of the CALCRIM instruction, suggests that implied malice can support a finding of murder in the first degree, which is not correct.[7] (*People v. Moon* (2005) 37 Cal.4th 1, 29; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1245-1246.) Nonetheless, the mistaken implication is entirely harmless because the court's further instruction taken from CALCRIM No. 521 indicates that

---

[7] This incorrect implication is not present in the language of the recommended form instruction. The comparable final sentence as stated in CALCRIM No. 520 reads: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. ___."

murder in the first degree requires the defendant to have acted willfully and "[t]he defendant acted willfully if he intended to kill." Moreover, the explanation of both "deliberately" and "premeditation" given by the court requires the defendant to have "decided to kill." Thus, under the court's instructions the jury could not have found defendant guilty of first degree murder unless it found that he acted with the intent to kill. The jury could not have found defendant guilty of first degree murder, as defendant contends, "based on the legally insufficient theory of premeditated implied malice murder." (*People v. Pensinger*, *supra,* 52 Cal.3d at pp. 1245-1246.)

### 3. *Ineffective assistance of counsel and cumulative error*

Defendant's protective argument that his trial counsel was ineffective if he failed to preserve any of the errors asserted on appeal is academic, since we do not find that any of the claimed errors were forfeited for failure to object in the trial court. His assertion that the asserted errors were cumulatively prejudicial necessarily fails because we have found no meritorious claim of error.

### 4. *Parole revocation fine*

Defendant contends that the court improperly imposed a stayed $300 parole revocation fine under section 1202.45, subdivision (a) in addition to a $300 restitution fine under section 1202.4, subdivision (b). Defendant argues that section 1202.45, subdivision (a) authorizes the fine only if the defendant's sentence "includes a period of parole" and his 26-year-to-life sentence does not include such a period. He relies on *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183, which held that the parole revocation fine is inapplicable when the defendant is sentenced to life imprisonment without the possibility of parole—i.e., when parole is prohibited. That is not the case here. Although defendant's sentence does not expressly provide for a period of parole, he is nonetheless eligible for parole, so that by operation of law his sentence carries with it a suspended parole revocation fine. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) In all events, the fine is suspended and will become payable only if defendant "does begin serving a period of parole and his parole is revoked." (*Ibid.*)

**5.** *Prejudgment custody credit*

Finally, defendant contends the number of prejudgment custody credits to which he is entitled was miscalculated as 831, rather than 832, days. The Attorney General does not object to awarding defendant the additional one day of credit.

## Disposition

The judgment is affirmed. The abstract of judgment shall be modified to indicate that defendant is entitled to 832 days of prejudgment custody credits.


_____
Pollak, Acting P. J.


We concur:


_____
Siggins, J.


_____
Jenkins, J.