Filed 7/18/22  P. v. Torres CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B311356 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA448503) |
| v. | |
| PEDRO TORRES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Mark S. Arnold, Judge.  Affirmed.

Aaron Spolin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Pedro Torres was convicted of attempted murder and shooting at an occupied vehicle. Gang and firearm use allegations were found true as to both counts. The trial court denied defendant's motion for a new trial and sentenced him to a prison term of 17 years, plus 25 years to life. On appeal, defendant contends the court erred in denying his motion for new trial because there was no credible, substantial evidence demonstrating his involvement in the crimes and because relevant third party culpability evidence was improperly excluded.

We reject defendant's arguments and affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged, along with codefendant Jose Steven Ramos, also known as Chepe, with one count of premeditated attempted murder (Pen. Code, § 187, subd. (a), § 664; count 1) and one count of shooting at an occupied vehicle (§ 246; count 3). It was alleged the attempted murder was committed for the benefit of a gang (§ 186.22), and that defendant personally used and discharged a firearm causing great bodily injury to the victim (§§ 12022.53, subds. (b)-(d), 12022.7, subd. (a)). The gang allegation and firearm use allegations pursuant to section 12022.53 were also alleged as to count 3. (Count 2 was dismissed before trial.) Codefendant Ramos is not a party to this appeal.

### 1. The Shooting

On July 9, 2016, G.C. was on his way to visit a friend. (We refer to the victim and witnesses by their initials to protect their privacy.) He was driving his red or burgundy-colored Ford Edge. While driving down 53rd Street in Los Angeles, he saw an

2

acquaintance he knew as Jesse running down the sidewalk. Jesse waved at him to pull over. G.C. pulled into a driveway and stopped. Jesse jumped into the front passenger seat.

Almost immediately after Jesse got into the car, G.C. noticed a man standing about four or five feet from his driver's side door, pointing a gun at him. The gun was larger than a handgun, about a foot and a half long. The man was about five feet eight inches to five feet nine inches tall and approximately 160 to 170 pounds. He had short hair, "a bit" longer than G.C.'s hair. The man said "Playboys" and started shooting at him.

G.C. tried to back out of the driveway but there was a white sedan blocking him. A Hispanic man was in the driver's seat. G.C. rammed the white sedan in trying to get away. Jesse jumped out of the car and ran off. G.C. never saw Jesse again.

Bleeding from two gunshot wounds, G.C. got out of his car and saw the shooter get into the white sedan behind him. The car then sped off. G.C. asked a bystander to call 911.

M.H. lived next door. She was outside with her daughter when the events unfolded. After her daughter called 911 in response to the shooting, M.H. spoke to the 911 operator and reported a shooting had just occurred.

Officers arrived on the scene and spoke briefly with G.C. about what had happened. G.C. was then taken to the hospital. He had gunshot wounds to his neck and stomach that required surgery. Doctors left a bullet lodged in his cervical vertebrae because removal was determined to be too risky. G.C. was hospitalized for a week, and at the time of trial, he was still suffering some disability, including difficulty turning his head and lifting heavy objects.

3

## 2. Witness M.H.

Shortly after the shooting, Officer Jorge Munoz spoke with M.H. She was nervous and told him she did not want to be seen talking to the police because gang members were involved. She told him her former neighbor, whom she knew as Chepe, drove up in a white sedan. Someone from the front passenger seat got out with a gun and shot at someone seated in a red car in the driveway next door. M.H. said Chepe was known to be in the Playboys gang and his wife and children still lived in the house next door.

Several days later, M.H. was shown a six-pack photo array (six-pack) and identified codefendant Ramos as Chepe.

At trial, M.H. testified that a man she knew as Chepe used to live next door, but he had moved out. His wife and children still lived there. She identified codefendant Ramos in court as Chepe. She denied knowing he was a member of the Playboys gang but said she may have heard a rumor he was a gang member.

M.H. said she was outside with her daughter watering her yard when a red car pulled up in the driveway next door. She saw a man, who was facing away from her, pointing a gun, larger than a handgun, at the red car. She took her daughter inside and heard gunshots. She looked out the window and noticed a white car. She denied seeing Chepe in the driver's seat and said she did not recall her conversation with Officer Munoz. She saw a man bleeding and crying out for someone to call 911.

M.H.'s conversation with the 911 operator was played for the jury. She confirmed it was her voice on the recording. She told the operator that a man called Chepe drove up in a white car, another man got out of the car and shot at a person in a red

car, then got back into the white car. The white car then drove away. M.H. testified that when she was talking to the 911 operator she was "nervous and confused" and "not sure what [she] was saying."

M.H. authenticated her initials on the six-pack identifying Chepe and her handwritten note that said she saw Chepe driving the white car and that a passenger got out and shot a person in another car.

M.H. said at some point after the shooting, a woman came to her home and yelled something to the effect that she better stop talking to the police. After coming to court, she realized the woman was Ramos's mother.

3. **Victim G.C.**

G.C. was first interviewed by Detectives Ricardo Rivera and Jesse Audelo of the Los Angeles Police Department on July 12, 2016, three days after the shooting, while he was still recovering in the hospital. G.C. told Detective Rivera the shooter was probably about the height of Detective Audelo. Detective Audelo is five feet 10 inches tall. G.C. could not identify the driver of the white car, only that it appeared to be a man.

The next day, Detective Audelo returned to the hospital to show G.C. a six-pack. Based on information he had learned from an officer in the gang unit, defendant's photograph was in position No. 2. G.C. identified defendant as the shooter and placed his initials next to his photo. G.C. testified he was thinking clearly at the time despite his physical condition and was certain defendant was the person who shot him.

In September 2016, G.C. was brought to the police station to view an in-person lineup of suspects. Defendant was standing in position No. 5. Detective Audelo testified that after the

admonitions were given, G.C. walked up to the one-way mirror and stood directly in front of defendant. G.C. looked at defendant for about 30 seconds and then identified him as the shooter.

At trial, G.C. positively identified defendant as the person who shot him.

On cross-examination, G.C. admitted that videotape from the body cameras worn by the responding police officers showed him telling the officers the shooter tried to steal his car and that the suspect or suspects were bald. G.C. explained that no one demanded his car, he just assumed that is what they were trying to do. He reiterated the only thing the shooter said to him was "Playboys." He said the shooter was not bald and he must have been confused.

**4.     Witness F.R.**

On the afternoon of July 9, 2016, F.R. was sitting on the hood of his car, which he had double-parked on 53rd Street. F.R. was waiting for a parking space to open up when the shooting occurred.

F.R. testified he had lived in the neighborhood for about seven years and knew it was territory claimed by the Playboys gang. As he waited for a parking space, he noticed a white sedan was double-parked behind him. Three guys were talking in a driveway across the street. One had long hair in braids and was "tatted up." One had very short hair, almost bald. F.R. had seen those two hanging out together before and he knew the guy with the long hair and tattoos was in the Playboys gang. At some point, a red car started to drive down the street. F.R. heard one of them, perhaps the third guy, say, "that's him." The red car eventually pulled up and parked in the driveway. The white sedan moved up behind the red car to block it. Almost

6

immediately thereafter, F.R. heard gunshots but did not see who fired the shots. The red car tried to back out and crashed into the white sedan.

F.R. used his phone to videotape the white sedan driving off. F.R. admitted he initially told the police he could not identify the individuals in the white car, even though he recognized them from the neighborhood. He also said he was unsure of who was driving as they left, but he thought it was the one with short hair who was almost bald, and the guy with the long hair was in the passenger seat. F.R. showed the video to Officer Munoz. The videoclip also showed a Hispanic male fleeing the scene on foot.

F.R. testified he was scared to come to court, that he had been told gang members would come after him if he testified, and that was the reason he had refused to appear and had to be subpoenaed. F.R. identified Ramos as the individual with long hair and defendant as the individual with short hair who looked almost bald. He said he was confident they were the two individuals he saw on the driveway that day and who he had seen together in the neighborhood on prior occasions.

On cross-examination, F.R. denied having lunch with the prosecutor or Detective Rivera before his testimony. He said the reason he did not identify the two defendants earlier in the day was because he could not see them clearly at that time, because they were obscured "behind ladies," apparently referring to their respective attorneys.

**5.     Other Evidence**

Officer Luis Lopez, who testified as the prosecution's gang expert, was familiar with codefendant Ramos. He knew him to be an active Playboys gang member with the moniker Chepe. Officer Lopez was also familiar with defendant, having learned

7

from "at least two different confidential informants" as well as other individuals from the community that Ramos and defendant were associates and hung out together "quite a bit." Officer Lopez told Detective Audelo about the relationship between Ramos and defendant and suggested he put defendant's photograph in a six-pack. Detective Audelo prepared the six-pack he showed G.C. at the hospital based on this information from Officer Lopez.

Officer Lopez testified about the Playboys gang, their claimed territory, membership, activities, tattoos, hand signs, known hangouts and gang culture generally. He identified Ramos, defendant and other Playboys members in various photographs taken at known gang hangouts. There was graffiti associated with the Playboys gang on the curb near where the shooting occurred.

The police located a white Buick parked on a street a few blocks from where the shooting took place. It had damage on one side with red paint transfer. The forensic unit dusted the car for fingerprints. One fingerprint from a soda can inside the car was a match to codefendant Ramos. None of the prints obtained from the car was a match to defendant. Evidence was presented showing that Ramos bought the Buick in February 2016, about five months before the shooting.

Defendant was arrested on July 14, 2016. At the time he was booked, defendant was reported to be five feet six inches tall and 135 pounds. A search was conducted at defendant's home. No evidence related to the shooting was recovered. On July 26, 2016, codefendant Ramos was arrested. He ran when police arrived at his home and was apprehended with the assistance of a canine unit.

**6. Defense Evidence**

Dr. Kathy Pezdek, a professor of psychology who specializes in cognitive science, testified about the different factors that impact the reliability of eyewitness identification, such as stress, duration of exposure, lapse of time from exposure to identification, complications arising from cross-race identification and the procedures used in the identification process.

Marc Scott Taylor, a forensic scientist, testified about the DNA samples taken from several personal items located in the white Buick, including a razor and a container of lip balm. One sample contained male DNA that did not match defendant or Ramos. The other samples were inconclusive.

**7. The Verdict and Sentencing**

The jury found defendant guilty of attempted murder and shooting at an occupied vehicle and found true the personal firearm use and gang allegations. The jury found not true the allegation the attempted murder was premeditated.

Defendant was sentenced to a 17-year determinate term plus a consecutive term of 25 years to life on count 1 (7-year midterm for attempted murder, plus 10 years for the gang enhancement and 25 to life for the personal firearm use enhancement). The lesser firearm use enhancements were imposed and stayed. The court also imposed and stayed sentence on count 3 pursuant to Penal Code section 654.

This appeal followed.

## DISCUSSION

**1. Insufficient Evidence**

Defendant contends the trial court abused its discretion in denying his motion for new trial based on insufficient evidence. Defendant argues there is insufficient evidence to establish his

involvement in the shooting beyond a reasonable doubt. He says the victim's identification of him as the shooter was problematic at best, the testimony from the other witnesses was contradictory, and there was no physical evidence connecting him to the shooting.

"The trial court has broad discretion in ruling on a new trial motion, and its decision will be disturbed only for clear abuse of that discretion." (*People v. Iraheta* (2014) 227 Cal.App.4th 611, 619 (*Iraheta*), citing *People v. Ault* (2004) 33 Cal.4th 1250, 1260.) We find no abuse of discretion.

It is well established that "unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see also Judicial Council of Cal., Criminal Jury Instructions (2019) CALCRIM No. 301 ["The testimony of only one witness can prove any fact."].)

There was nothing physically impossible or inherently improbable about G.C.'s identification of defendant as the person who shot him. G.C. identified defendant from a six-pack, in an in-person lineup, and again in court during trial. G.C. said he was certain defendant was the shooter.

Defendant argues there were inconsistencies that undercut G.C.'s credibility, including whether defendant fit the physical description provided by G.C., as well as contradictory testimony from the other witnesses.

To the extent there were inconsistencies in G.C.'s testimony, those were for the factfinder to weigh and resolve. Given the totality of G.C.'s testimony, the jury was justified in crediting his identification of defendant as the shooter, as was the court in ruling on and denying defendant's motion for a new

trial.  Defendant has not shown the trial court abused its discretion in concluding the evidence at trial was sufficient to support the verdict.

## 2.    Third Party Culpability Evidence

Defendant contends the trial court abused its discretion in denying his motion for new trial on the grounds his proffered third party culpability evidence was improperly excluded. Defendant says the fingerprints lifted from the outside of the white Buick, four of which belonged to two known Playboys gang members, were relevant physical evidence that cast doubt on his guilt and should have been admitted.  We apply the same deferential standard of review to the trial court's order excluding evidence as we applied to the claim of insufficient evidence. (*Iraheta*, *supra,* 227 Cal.App.4th at p. 619.)  Again, we find no abuse of discretion.

Third party culpability evidence is relevant and generally admissible *if it links* the third person to the "actual commission of the crime."  (*People v. Brady* (2010) 50 Cal.4th 547, 558; accord, *People v. Hall* (1986) 41 Cal.3d 826, 833 ["there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime"].)  Evidence of mere motive and opportunity is insufficient.  (*Brady*, at p. 558.)

   Here, defendant did not establish any connection between the two other Playboys gang members and the shooting of G.C. The fingerprint evidence proves only that they touched the outside of the white Buick at some unspecified time. Codefendant Ramos bought the Buick almost five months before the shooting, and any number of fellow Playboys gang members could have had access to Ramos's car during that time. Defendant was free to argue the lack of physical evidence and

11

that none of the fingerprints from the car were a match to him. Indeed, defense counsel emphasized this point in closing argument, along with the lack of any DNA evidence linking defendant to the personal items located in the car. Defendant did not present evidence, however, that either of the two Playboys were involved in the crime and left their prints on the car on the day of the shooting. Defendant offered only speculation they may have been involved.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.

WE CONCUR:


STRATTON, P. J


HARUTUNIAN, J.*

---

*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.